CARTWRIGHT *et al. v.* WILMERDING *et al.*

The Factors' Act (ch. 179 of 1830) protects one who makes advances upon the faith of the documentary evidence of title furnished by a warehouse-keeper's receipt of imported goods procured by a factor by his being intrusted with an invoice of the goods, although the invoice showed that the goods belonged to the shipper.

The factor's making a warehouse entry at the custom-house, taking a warehouseman's receipt and transferring it with authority to make the withdrawal entry at the custom-house, enable the pledgee to reduce the property to his possession as effectually as. a custom-house permit, and are equivalent thereto as a security under the act.

The pledgee, acting upon the faith of documents which, according to the course of business, were sufficient to transfer the property in goods warehoused subject to duties, and which contain nothing to indicate any title out of the pledgor, is not bound to inspect the warehousing entry which is retained at the custom-house, and, in the course of business, would not be in possession of the owner of goods which he had himself imported.

It is unnecessary that the principal should have intrusted his factor with the identical evidence of title on the faith of which he procures a loan. Intrusting him with the primary document is equivalent to intrusting him with all others which, in the ordinary usage of trade, grow out of it.

That the pledge, and the delivery of the documentary muniments thereof, are separated by some interval of time, is no otherwise important than as it may raise a suspicion that the giving security was an afterthought.

Goods in warehouse, subject to be withdrawn at pleasure by a factor, on discharging the lien of government for duties, may be regarded as in his possession, so as to support a pledge thereof made by him, independent of the provisions of the act in regard to documentary evidences of title.

APPEAL from the Superior Court of the city of New York. Action by the plaintiffs, who were English manufacturers, under the firm of Cartwright & Warners, to avoid two pledges of merchandise made by Acker & Harris to the defendants. The trial was by the court, without jury, and the judge found these facts:

The plaintiffs, between January and August, 1857, made five shipments of hosiery, consigned to Acker & Harris, who were merchants in New York, and for two or three years had

been their agents for the sale of their goods, to be sold for and on account of the plaintiffs. Invoices were sent to Acker & Harris with each consignment, to which were appended affidavits, stating that Cartwright & Warners were owners, which were presented to and left with the collector by Acker & Harris at the times when they entered the goods at the customhouse. Acker & Harris were not in advance for Cartwright & Warners; and Cartwright & Warners did not intend that the goods should or would be warehoused, but that Acker & Harris should pay the duties at once. Instead, however, of paying the duties and taking the goods from the vessels, Acker & Harris entered the goods for warehousing, pursuant to the act of March 28, 1854. (10 U. S. Stat. at Large, 270.) The entries for warehousing stated the goods to have been imported by Acker & Harris. The goods were deposited in the bonded warehouses designated by Acker & Harris, and thereupon they received from the proprietors of the warehouses, respectively, receipts describing the numbers and marks of the cases or packages containing the merchandise, and stating them to have been "received in bond, for account of Messrs. Acker & Harris."

The course of business in respect to warehoused imports is as follows: The bonded warehouses constituted by the act and the treasury regulations are required to be used solely for this purpose, and for unclaimed and seized goods in the custody of the collector. The buildings belong to individuals, but by said regulations they are placed in charge of an officer of the customs, who, together with the proprietor of the warehouse, has, under the act of Congress, "the *joint custody*" of the stored merchandise. (Act, § 1.) A deputy collector, as the storekeeper of the port, is the storekeeper of the goods in all those warehouses, and the officer of the customs in charge of each particular warehouse is designated an assistant storekeeper. When goods which have been entered for warehousing are intended to be withdrawn, the regulations require that a withdrawal entry be made by the party who made the first entry, or some person authorized by him. The party

Cartwright *v.* Wilmerding.

making this withdrawal entry must sign it; and thereupon, as soon as the duties are paid, the collector will issue a permit for delivery to the person making such withdrawal entry, and the goods cannot be taken out of the bonded warehouse without such permit. According to the usage and practice at the New York custom-house, the written authority to make the withdrawal entry, thus required from the party who makes the first or warehouse entry, may be put on the face or on the back of the original withdrawal entry. A practice existed in 1857, *wherein ...* among the proprietors of the bonded warehouses in the city of New York, for the purpose of facilitating sales and transfers of goods "in bond," as hereinafter stated: The warehouseman keeps a book in which he enters all the goods received, and, if requested by the importer, he issues a certificate acknowledging the receipt of the goods "for the account of" the importer, naming him. This certificate is returned to the warehouseman before a delivery of the goods. And whenever the certificate is returned by any one to whom it has been transferred by written indorsement, the warehouseman, if requested, enters on his book that the goods are so transferred. Such changes are made by the warehouseman, from time to time, as often as required by the importer or his assigns. On "sales in bond," the seller writes the authority to enter for withdrawal on the back or the face of the original warehousing entry, or, taking a printed blank form of a withdrawal entry, he fills it up with the proper marks, &c., so as to distinguish the goods, and also fills up the printed blank authorization to make the withdrawal entry at the foot, and signs the latter. The books thus kept for the convenience of trade by the warehouseman are not the official books or accounts in which the receipt and delivery of goods in a bonded warehouse are entered on behalf of the Government by the custom-house officer in charge. The certificates are issued without referring to the entries at the custom-house; and the practice of issuing them was devised by the warehousemen, according to their own views of fitness, without any form being prescribed by the Government. These warehousemen's certificates are not

required to be produced at the custom-house, and have no authority as it regards the collector's action.

The merchandise in question was never in the possession of Acker & Harris, otherwise than as it was, in warehouse, practically subject to their control under the course of business just stated.

In July, 1857, Acker & Harris made an arrangement with the defendants, who were auctioneers, under the firm of Wilmerdings & Mount, by which the latter agreed to make, and subsequently did make, advances upon the pledge of these goods, in anticipation of the sale of them at auction. The advances were in the promissory notes of Wilmerdings & Mount, given by them to Acker & Harris, with an agreement that, unless they should be put in funds, by the sale of the goods or otherwise, to meet the notes at maturity, they should take and sell the goods to reimburse themselves, with their commissions. The notes thus given were paid by the defendants. It was expressly found that the advances were made by Wilmerdings & Mount in good faith, actually believing and on the faith that the merchandise was owned by Acker & Harris, and without any notice or suspicion that any other persons had any interest in such goods. The first advance was as follows: Eighty-two cases were, on 18th July, 1857, left in bonded warehouse. Seven other cases were at the appraiser's office, undergoing examination as to the dutiable value. On said 18th of July, 1857, Acker & Harris delivered these parcels of merchandise to Wilmerdings & Mount, for sale at auction, and obtained thereon an advance of $45,000. The precise mode of this delivery was as follows: Before or at the moment of the advance, Acker & Harris handed to Wilmerdings & Mount the warehouseman's certificate for each parcel, in the form before described, with this indorsement: "*Deliver to Wilmerdings & Mount, or order. Acker & Harris.*" At the same time Acker & Harris agreed to give to Wilmerdings & Mount like certificates for the seven cases remaining at the appraiser's office, as soon as they should be examined and sent to the warehouses. The certificates handed to Wilmerdings &

Mount were sent immediately to the warehouses, and the usual entries of the transfers were made by the warehousemen in their respective books. A few days afterwards, say on the 27th of July, 1857, and agreeably to the engagement of Acker & Harris at the time of the advance, a precisely similar handing in of indorsed certificates and transfers thereof took place in respect to the said seven cases which had been at the appraiser's office. At the moment when the advance was made, Acker & Harris agreed to go immediately to the custom-house and indorse over the entries to Wilmerdings & Mount. This was not done immediately. The second advance of $50,000 was conducted in the same manner, except that the indorsement of "transfer to the order of Wilmerdings & Mount" was not made by Acker & Harris upon the warehouseman's certificates at the very moment of the advance. It was inadvertently omitted until three or four days afterwards. Wilmerdings & Mount, with one exception, took out new certificates, in their own favor, from each of the warehousemen, shortly after they received the original certificate from Acker & Harris. The only papers exhibited to Wilmerdings & Mount before the advances, besides the warehouse certificates, were memorandum invoices, stating the name of each vessel and against that the number of pounds sterling of the consignment of that vessel, without other particulars. Neither did Wilmerdings & Mount see the goods. After the advances, and on the 22d of August, 1857, learning that Acker & Harris had not, as agreed, indorsed over the entries at the custom-house, Wilmerdings & Mount requested Acker & Harris to do so. Accordingly, on that day, Acker & Harris went to the custom-house and wrote upon each of the warehouse entries a certificate, in the regular form, authorizing Wilmerdings & Mount to withdraw the goods. Wilmerdings & Mount were not present at the making of this certificate. By the treasury regulations the archives of the custom-house are all secret, except that, on special application in writing to the collector, he, in his discretion, may give "the particular information or data requested."

The judge held that the plaintiffs were the true owners of the goods, and that the defendants had no lien or valid claim to them. The judgment entered upon his direction having been affirmed at general term, the defendants appealed to this court.

*Charles O'Conor,* for the appellants.

*C. Van Santvoord,* for the respondents.

GOULD, J. This case involves the construction of the statute of this State commonly called the *factors' act,* which is an act "relative to principals, factors and agents," passed April 16th, 1830; and is to be found in the Laws of 1830, page 203, and in 3 Revised Statutes, 5th edition, page 76. The act was intended to modify and make certain, (in its practical application to the current transactions of trade and commerce,) the general common-law rule, that, where one of two innocent persons must suffer loss from the act of a third person, such loss shall be borne by him, who has placed the third person in the position which enabled him to do the act causing the loss.

The third section of that act is the most important one; indeed, the only important one, except that it is itself to be construed in part by the rest of the act. But for the purposes of the case before us, this third section is the only one to be referred to; and, in view of some decisions that have been had upon it, we shall need to examine but a part of that section. It is this: "Every factor or other agent entrusted with the possession of any bill of lading, custom-house permit, or warehouse-keeper's receipt for the delivery of *any such* merchandise; and every such factor or agent, not having the documentary evidence of title, who shall be entrusted with the *possession of any merchandise* for the purpose of sale, or as a security for any advances to be made or obtained thereon; shall be deemed the true owner thereof, *so far* as to give validity to any contract, made by such agent with any other person, for the sale or disposition of the whole or any part of such merchandise,

for any money advanced, or negotiable instrument or other obligation in writing given by such other person *upon the faith thereof.*"

The first section of the act speaks of any person in whose name "any merchandise shall be shipped," and provides for liens in favor of the consignee of "*such shipment.*" So that the third section, in speaking of the possession of "any bill of lading, custom-house permit, or warehouse-keeper's receipt for the delivery of any *such* merchandise," plainly and necessarily refers to such merchandise as has been named before; that is, merchandise which, in the course of trade, has been so shipped that, prior to its coming into the possession, (actual or legal,) of the consignee, certain "*documentary evidence of title*" does, by the established usages of trade, (which make and which are the law merchant,) give the entire and exclusive control of the delivery of the property to the person holding such documentary evidence. In contrast to this, (and making the construction more clear,) the next clause of the third section speaks of a different subject—of merchandise which is so situated as not to require such documentary evidence of title, but is in the possession of the factor; and then it says, (not any such merchandise,) but "*any* merchandise," whether ever shipped, or ever connected with any bill of lading, &c., or not; it says, "any person, who shall be intrusted *with the possession of any merchandise* for the purpose of sale," &c., shall be deemed the owner, &c. Thus we have two distinct classes of cases; one where a factor is intrusted with complete documentary evidence of title; the other where he is intrusted with the possession, which is, *per se*, evidence of title; and to avoid the evil of making this possession evidence of title in all cases, this section provides that the factor shall be intrusted with the possession "for the purpose of sale, or as a security for advances *to be* made, or *obtained* thereon;" while the sixth section guards expressly against a sale, &c., by any one who is a mere bailee "for transportation or storage only;" providing that no such bailee ("common carrier, warehouse-keeper, or other person,") shall sell or hypothecate the merchandise so committed

(intrusted) to him.   And, in passing, we may note that this use of the word "hypothecate" shows that the statute has been properly construed, (in the decisions of our courts), as providing for a pledge of the merchandise, either by the holder of the documentary evidence, or by the possessor.

   In the construction of this third section, it is claimed that the documentary evidence (as well as the possession,) must be intrusted "for the purpose of sale," &c.   This is probably so, although the English statute, (6 Geo. IV, noted *post,*) does not require anything as to the purpose for which the documents shall be intrusted.   But it is not necessary for the decision of this case that we decide that point; since there is no doubt that all the control, and all the evidence of title, which Acker & Harris. had, they had "for the purpose of sale;" which includes (under the statute, though not at common law), the "disposition" of any title less than the whole.   Being entrusted for the purpose of absolute disposition, and so considered the true owners, they could, of course, make a conditional one, even though the goods were not intrusted to them for that purpose.

   The statute 6 George IV, chapter 94, section 2, differs decidedly from ours, as it says nothing of a factor in possession; being confined to those who have documentary evidence of title.   Yet it is quite probable that the draughtsman of our act referred to this English statute for some of his terms; since, while using one of our technical terms (not used in the English act), "custom-house permit," he adds, "warehouse-keeper's receipt," a term not then known in our commercial vocabulary, as we then had no bonding or warehousing system.   It was probably used in expectation of such a system, which had been called for by our importers.   At any rate, if our previous construction of the words "*such* merchandise" be correct, this use of "warehouse-keeper's receipts" cannot refer to a private warehouse-man, who receives goods directly from the owner; although the sixth section of our act does use the word "warehouse-keeper" in that sense.   The phrase in the third section, must have reference to a warehouse-keeper of shipped or

imported goods; some one connected with, if not in, a public employment.

The English statute, and our own, were manifestly passed for the purpose of increasing the facilities of trade, by legalizing and explaining the cases in which a party could sell, or pledge, property at sea, in the ship at dock, or lying in the warehouse subject to the payment of duties. Historically, the necessities of trade and the custom of merchants had, in both countries, anticipated the statutes. And the benefits of the statutes and the custom are too evident, and too great to allow us to narrow the construction of the law. And there is no sound principle which would oppose a liberal view, tending to enlarge the facilities of transfer; since these acts but follow out the general rule, that every man is bound to take care not to select an agent, who will do acts to injure other persons.

To proceed with the case: To which of the two classes of factors above specified, did Acker & Harris belong? They had been "intrusted" with the bill of lading; and it had performed its office by securing to them an entry at the customhouse — a regular, legal, customary entry, known as a warehousing entry; by virtue of which they, and the person whom they might authorize — and no other — could, upon paying the duties, take delivery of the goods. Further, according to the custom of trade, they had, upon and as a consequence of such warehousing entry, procured a warehouse-keeper's receipt that he held the goods "*for their account,*" practically subject to their order so far as he was concerned, and, by law, absolutely at their risk. To be entitled to enforce that receipt, they needed to make a withdrawal entry at the custom-house; (which withdrawal entry could by law be made only by the party in whose name the merchandise was warehoused, or by some person duly authorized for the purpose by him;) then pay the duties, and procure the "custom-house permit."

The authority to a third person to make the withdrawal entry, was to be a simple writing: "I authorize A. B. to withdraw from warehouse the goods described in this entry;" and might be on the original entry, or on the withdrawal entry.

The warehousing permit, (issued on the surrender of the bill of lading and the making of the warehousing entry,) would regularly be followed by the withdrawal entry; and the withdrawal entry, (or the exclusive authority to make it,) with the warehouse-keeper's receipt, furnished to "the holder the *exclusive means* and power *of obtaining the possession of the property meant to be pledged, and would be a bar to any disposition of it,*" to any but this holder; and thus these documents are in just the same relation to the property, and exercise precisely the same control over it, as would a "custom-house permit;" and it is not easy to see why the authority to make the withdrawal entry, coupled with the warehouse-keeper's receipt, is not as "effectual security for any advance made upon its faith," as the custom-house permit would be. (Judge DUER's opinion in *Bonito* v. *Mosquera*, 2 Bosw., 441.) Certainly they come within the ruling (2 Bosw., 444), that they must be "such documents as will enable the pledgee, with certainty at the proper time, to reduce the goods into his own possession, and in the meantime prevent any other person from legally acquiring a hostile possession;" and it can hardly be material that, to obtain this possession, the pledgee must pay the duties. That act, also, is exclusively within his own power.

Since the passage of the statute, there is no legal need of saying that any of the documents named in the acts give the holder constructive possession of the property; for the statute, while it calls them "documentary evidence of title," makes them equal, in validity, to possession, and leaves us to call them what they are, with the same legal effect as if we gave to the facts the former designation, which is descriptive of their legal effect. In brief, the effect of the statute seems to be, that he who has such documentary evidence of title, as gives him the exclusive control of the possession, shall be held the true owner of the property for certain purposes, provided the true owner has intrusted him with such evidence, for the purpose of disposing of the property. A factor so situated can sell, or pledge the whole or any part of the property, or give upon it any lien or security for advances, or, in short, treat it as his

own. Intrusted with the disposing control, he can exercise that control; and if he misappropriates the property or its avails, his principal must suffer — not the person who has dealt with the factor "on the faith" of the position, in which the principal has placed him.

If the former conclusions, as to the control which Acker & Harris had, be correct, they would seem to be within this class of the factors named by the statute; that is, holders of such documentary evidence as gave them the exclusive control of the possession of the goods.

Were they intrusted with this evidence, by the plaintiffs? It would seem a very narrow construction of the act, to hold that they must have received from the plaintiffs the identical document which, at the time of the pledge, constituted the evidence of their title. If so, the instant they surrendered the bill of lading, even on paying the duties and taking a "custom-house permit," they could not have sold the goods without going through the form of themselves receiving the goods; for, literally, they did not receive the custom-house permit from the hands of the plaintiffs: the plaintiffs did not actually, literally, intrust that to them. And can we hold any different rule in regard to any one of the formal documents which, in the regular course of lawful trade, are obtained, or obtainable, at the custom-house, for controlling the possession of the goods? Intrusting with the primary documents, out of which all the others grow, in the usual course of trade, must be held an intrusting with all those others.

In holding these views, it is by no means necessary for us to interfere with the decisions under the English statute, cited to us as showing the strictness with which that statute has been held to mean, that the identical document must have been intrusted by the owner to the factor. The scope of that act was entirely different from that of ours. It, as already noted, said nothing of a factor's actual possession of goods; but left that, as at common law, not sufficient to authorize a pledge, unless the goods were left with him for that purpose. By confining itself to the possession of documentary evidence of

title, it showed an intent to depart as little as possible, (consistently with the wants of trade,) from the strict common-law rule. And the English courts, in construing such a statute strictly, upon this point of intrusting the document to the factor, but acted according to the general intent of their statute. By such strict construction, they retained for the owner the power to insert, in the very document he intrusted, just such safeguards against a misuse of the authority, as he saw fit; which safeguards would not accompany a secondary or substituted document, procured by the factor himself, by virtue of his having the original document.   Upon this principle of construction were based, and correctly based, the cases cited to us. (6 Mees. & Welsb., 572; 9 id., 647; *S. C.*, in H. of L., 14; id., 665.)

But our statute departed entirely from the common law; and, by making a factor's possession such evidence of ownership as to enable him to do all acts, which the true owner might, manifested a totally different intent from that of the English act.   Substantially, it left an owner to use his precautions when he selected his factor; thereafter leaving him to be responsible for the acts of his agent, and protecting a *bona fide* third person in any transaction fairly effected with the apparent owner.   And, for the benefit of trade, the statute said that the delays incident to following up the line of title, and the extent of authority, might be dispensed with, except so far as the statute itself retained them, that is, as to bailees receiving goods for carriage.

That the course of trade really called for such an act as ours is, upon this construction, is made clear by the course of English legislation on the same subject.   Immediately upon the decisions in Meeson & Welsby (above cited), Parliament passed an act (5 and 6 Vic., c. 39), giving the same effect to a factor's actual possession as our act gives.   And in the same spirit, and as it were for the very purpose of preventing the force of the prior decisions on the point of "*intrusting*" documents, &c., a section of that act provides that an agent possessed of any of the documents of title mentioned in the act, "whether

derived *immediately* from the owner of such goods, or *obtained by reason of such agent's having been intrusted with the possession of the goods* represented by such documents of title as aforesaid, or of *any other* documents of title thereto, shall be deemed and taken to have been intrusted with the possession of the goods represented by such documents of title as aforesaid; and all contracts pledging, or giving a lien upon, such document of title as aforesaid, shall be deemed and taken to be, respectively, pledges of, and liens upon, the goods to which the same relates," &c.; "and an agent, in possession as aforesaid of such goods or *documents, shall be taken,* for the purposes of this act, to have been *intrusted* therewith by the owner thereof, unless the contrary can be shown in evidence." (9 Mees. & Welsb., 650, note.) This act not only comes up to ours, but overrules (by the legislature) the decisions, then seen to be inconsistent with the fundamental principle of this new act. Of necessity, those decisions have no force, under our act.

Three points remain to be considered: 1. Did the defendants make their advances "upon the faith" of the documentary evidence which the factors had? 2. Did they receive the evidence at the time of making the advances? 3. Had they knowledge, either that the factors were not the owners, or of facts from which the law charges them with notice of the true ownership?

As to the first of these points: The finding of fact is express, that the defendants made the advances in good faith, and "on the faith that the goods in question were owned by Acker & Harris; and on the security" of the pledge of those goods, in the manner stated.

That the second point ought to be a serious one; that a person, by the act made, *pro hac vice,* "the *true owner*" of the goods, cannot pledge them, without an instantaneously concurrent delivery of the bill of lading, custom-house permit, or warehouse-keeper's receipt; that he cannot receive the money on one day, and complete the contract of pledge on the next; seems a very strange position, even if there be English decisions of such a purport. To say, in such a case, that the

advance is made on. the faith of the promise to pledge, and not on the faith of the pledge, is a nicety of refining far too nice for the ordinary, common-sense, dealings of business men. If the time between the two acts, (long or short,) be such as to throw doubt on the transaction; such as, with connecting circumstances, to excite a suspicion that the advance was really a loan without security; and that pledging the goods was an afterthought; then the transaction is not within the protection of the statute. But all these are matters of fact, to be decided upon the evidence. It surely will not do to hold, as a rule of law, that a man, on receiving the money, cannot go around the corner to sign an order for the delivery of goods without changing the nature of his contract, and depriving the delivery of its agreed character of a pledge. In the case before us, the facts are found that, (notwithstanding the lapse of time before the authority was executed at the custom-house in favor of the defendants,) the advances were made " on the faith thereof," as required by the statute; and not on the faith of what has been called " the *executory promise to pledge*." Yet even on this question of time, the defendants knew of no delay. Acker & Harris were to make the authority to withdraw the goods directly to the defendants; and it was to be done at once at the custom-house : the defendants supposed it done.

The third point: Having, or being chargeable with, notice of the true ownership, is an element of the English statute, expressly; and it has correctly been held to be implied in ours. It is a condition, upon which the validity of the pledge or sale depends, that the person taking the pledge, &c., shall not have, either in fact or in law, any such notice. The case of *Stevens* v. *Wilson* (3 Denio, 472), and that of *Covell* v. *Hill* (2 Seld., 374), turned expressly on this point. In both, the pledgee had actual notice that the pledgor was not the owner. The case of *Stevens* v. *Wilson* did not profess to decide any other point; and that of *Covell* v. *Hill*, though discussing some points connected with this of notice, decides no other point under this statute.

By the finding, that the advances of the defendants were made "in good faith," their having any notice, in fact, of the true ownership of the goods, is expressly negatived. Were there circumstances connected with the transaction which charge them, in law, with such notice?

So far as the warehouse-keeper's receipt is concerned, certainly not. So far as the authority to them to make the withdrawal entry is concerned, they did not see it made; but trusted to Acker & Harris to do it at once, as they agreed to do. Were they bound to look up this warehousing entry, and see their authority duly executed? What were those papers, and where? This withdrawal entry, and the authority to the defendants to make it, are no papers that ever come to the possession of either the factor, or the purchaser (or pledgee) from him. Such papers are never in the possession of the actual owner when he imports his own goods, and warehouses them. They are custom-house papers; there retained, and "intrusted" to no one. The warehousing permit we have not in evidence. It is issued to the inspector of the port, requiring him to send to a specified bonded warehouse the particular goods; and the deputy inspector in charge of the bonded warehouse gives a receipt therefor to the inspector on board the vessel. (2 Bosw., 442.) This, of course, requires the goods to be stored for account of some one; and it must be the person for whose account the warehouse-keeper's receipt says they are stored; as he would not receive goods for account of one person, and give a receipt for them for account of another.

This warehousing permit is one of the series of papers, which are intrusted to the factor; and on surrendering it, and getting the goods sent to a warehouse, the only documentary evidence of which he has possession is the receipt of the warehouse-keeper, until he gets the final "custom-house permit," on signing the withdrawal entry and paying the duties. And, by the custom of trade, he may transfer the warehouse-keeper's receipt, by mere written order, to any one; thus transferring all the documentary evidence he has. And there-

after, even his written authority at the custom-house, in favor of a different person, would be of no avail. The warehouse-keeper would not surrender the goods, save on the return of his own receipt. It would thus seem that nothing, that the defendants were bound to examine, gave them any notice of the true title; and if this be so, they are entitled to judgment, reversing that of the Superior Court.

We may say, further, that in thus treating the case, as depending on the possession of the documentary evidence of title, we have viewed it in the light most favorable to the plaintiffs. For if the goods were, in law, in the possession of Acker & Harris (being confessedly so "for the purpose of sale," if so at all), there can be no doubt of the defendant's right to take them in pledge, or of the fact that they, having taken them in pledge, had as much possession as Acker & Harris had.

Had, then, Acker & Harris the possession in law of the goods? Certainly, unless it were in some one else. And for the purpose of determining this point, we can take judicial notice of the well-known course of trade, by which goods in bond are extensively dealt in, at their ports of importation. As if to afford facilities for this very course of trade, the law allows goods so to remain, with duties unpaid, for three years; and officers of the customs practically and habitually recognize all sorts of transfers from importers, and consignees, and from the different subsequent holders of transfers. In short, they are, subject to the lien for duties, dealt with precisely as if stored in a private warehouse. The custody which the officers of the customs have thereof cannot, in judgment of law, be deemed a possession of the goods. (22 N. Y., 368.) It is rather a qualification of the possession, which is vested in the keeper of the bonded warehouse, or in the consignee under whose permit they were placed there; and is a mere restraint upon removal, (not interfering with the right of possession,) which the security for payment of duties requires to be vested in the government, while the possession is considered to be in the person who had them placed there; or in the owner of

the warehouse, who is as much the agent of this person as he is (in a certain sense,) the agent of the government. The *transitus* is ended when the goods are so warehoused. After that, the carrier has certainly nothing to do with the goods.

In the case of *Mottram* v. *Heyer* (5 Denio, 632), it is held that, "where goods are placed in the public store, under the warehousing system, (either in this country or in England,) after a perfect entry of them for that purpose, they are to be considered as having come to the *possession* of the vendee, at the place where he intends they shall remain, until he gives further order for their disposal; and the law recognizes his right to sell or dispose of them as he pleases, subject only to the custody of the officers of the revenue for the security of the payment of the duties, &c. And in such a case the right of stoppage *in transitu* should be considered at an end the moment the goods are thus deposited, after a perfect entry for that purpose has been made." The opinion then cites a case (*Strachan* v. *Trustees of Knox & Co.*), referred to in Brown on Sales, 536, where goods were imported and deposited by the consignee in a bonded warehouse, under the provisions of the statute 43 George III, chapter 132—(the statute which commenced the warehousing system of England)—in which case the court decided the *transitus* was ended. These cases would sustain the position that the goods had come to the *possession* of Acker & Harris, and would protect the defendants under the second branch of our factor's act.

Except for this statute, there could seem to be no doubt that, at the time of making the pledge, Acker & Harris were in the legal possession of the goods, subject to the government's lien. And, under the statute, there seems no doubt that they were then in possession either of the goods themselves, or of a document of title mentioned in the act, viz., a warehouse-keeper's receipt; and whichever they had, they were intrusted with it by the plaintiffs. The name of a paper, which is evidence of title (as in this case, "warehouse-keeper's receipt"), is of no moment, provided it be a paper which, by the course

of trade, has the requisite character and force to satisfy the statute.

In either view, the judgment of the Superior Court should be reversed.

DENIO, DAVIES, SUTHERLAND, ALLEN and SMITH, Js., con- curring,

Judgment reversed, and new trial ordered.