By the Court, Robertson, Ch. J.
The most prominent question in this case is one of law, to wit, whether the defendants could be sued alone, without joining the officer of the customs of the United States, in whose custody, jointly with theirs, it is assumed the goods in controversy were placed; and if not, whether the United States officer can be made responsible for the loss of such goods.
The act of Congress of March 28, 1854, (10 U. S. Stat. at Large, 270, ch. 30; Brightly's U. S. Dig. 488, §§ 296-299,) by its first section provides that goods subject to duty may be stored, at the expense and risk of the owners in a private warehouse, used exclusively for such purpose, and approved of by a government officer, (secretary of the treasury,) in charge of a proper officer of the customs, who, with the owner of such warehouse, “ should have the joint custody of such goods.” But all labor on such goods is to be performed by such warehouse keeper at his own expense. Its third section requires such warehouseman to give a bond, to hold “ the United States and its officers harmless from, or on account of, any risk, loss, or expense of any kind or description, connected with or arising from the deposit or keeping of the merchandise of the warehouse.” And it declares that all goods so deposited shall be at the risk and expense of their owner. The 4th section of such act provides against any abatement of duties or allowance “for any injury, deterioration or loss sustained'by goods so deposited.” A subsequent act, passed in 1862, (Brightly’s Digest, 1222, § 58,) provides that, after the payment of duties on merchandise, they may still remain in such warehouses, in the custody of such United States officers, but at the expense and risk of the owners, and that the latter shall be entitled to ninety-nine per cent of the duties on exporting them directly to a foreign country.
*417 The purposes of these statutes is very plain. It was, at the same time, to give credit to the importer for duties, while securing for the government their payment. The system of the latter having stores of their own for the deposit of imported goods, was thus dispensed with; and private individuals, on securing the government against loss, were allowed to become depositaries of them for the joint account of the government and the consignees. In addition to that, in order further to protect the government, one of its officers of the customs was made a joint custodian with the warehouse keeper of the dutiable goods. Whatever .lien the warehouseman may have for storage, is postponed to the right of the government for its duties, (probably because he still holds the liability of the consignee,) except that where unclaimed goods are sold, by the second section of the act of 1854, he is entitled to be paid his charges out of the proceeds; probably because in such cases the owner is unknown. The statute of 1862 (ubi sup.) became necessary, because no goods, upon which no duties were due, could remain stored in such warehouse, and a continued joint custody by the officer of the customs and the warehouse man became necessary to protect the government from fraud.
It is very evident, therefore, that the “ custody’’ spoken of in such statutes was confined' to its original sense of a guard or watch, for the interests of the government, and was not intended to embrace legal possession for all purposes, since the same term is used in the statute of 1862, in pari materia with that of 1854, when the United States would have no lien on or interest in the goocls. There can be no doubt that, without that statute, the moment the duties were paid, the custody of the United States officer would cease, and the warehouse keeper would remain in sole, undisturbed possession, having a lien for any storage unpaid. Imported goods on their passage to this country are in the actual or constructive legal possession of the owner, importer or consignee, and when placed in the joint custody of the keeper of a bonded warehouse and an United *418 States officer of customs, they are so placed to secure the payment to the United States of duties, and to be taken care of in the mean time. In the ease of Cartwright v. Wilmerding, (24 N. Y. Rep. 536,) it was held by the highest court of the state that consignees retained “possession ” of dutiable goods stored in a bonded warehouse, under the factors’ act of this state, (N. Y. Sess. Laws, 1830, p. 203; 3 R. S. 5th ed. 176,) notwithstanding the ueustody” of the custom house officials, which was a mere restraint upon removing before the duties were paid. This accorded with the views of the same court in the prior ease of Waldron v. Romaine, (22 N. Y. Rep. 370;) where, upon a sale of goods stored in a bonded warehouse, (the proper documents for exportation having been executed by the vendors,) and their delivery to a carrier selected by the vendees, (to be, as required by law, under the charge of a public officer until exported,) they were destroyed by fire before the proper authority permitting their surrender by such officer was received, and it was held that such charge and custody of the custom house officer was only to protect the lien of the government, and did not interfere with the transfer of the title, or the right of possession, when the duties were paid. (See also Brissac v. Lawrence, 2 Blatchf. 121.) It is very evident, therefore, that the warehouse keeper was the guardian of the interests of the plaintiffs, that is, of the goods subject to the lien for duties, and became liable for their safe custody like any other bailee, unless he was deprived of all control of the goods, and could not make provision for their safe keeping, without being thwarted or controlled by the United States officers (if they were so minded,)' so as to be a mere automaton owning the warehouse, (having a right to storage and other charges, but) no duties to perform. The fact, that the warehouse was required by the government to be examined by suitable officers, for. their own protection, and to conform to certain regulations, would not debar the owner of it from taking every additional precaution for the safety of the goods, or *419 deprive him of his possession and control of the warehouse. If the government required the warehouse keeper to dispense with any precautions advisable for the safe keeping of the goods, and such omission was the cause of the loss, he might be excused upon the ground of inevitable accident, or that the exception from that cause formed part of the contract of the consignee of the goods with him. But there is no pretense of any such regulation or exclusion in this case. The defendants exercised sufficient uncontrolled dominion over the building, to enable them to use every precaution necessary for the safe keeping of goods deposited there. They were even bound, by the statutes before mentioned, to perform all labor on such goods at their own expense, and even indemnify the government against any expense, and were entitled to receive storage as compensation, commensurate with their care and trouble, for the exercise of due diligence. They are, therefore, liable for the want of such diligence.
In reference to the burden of proof of the absence of proper diligence, being negative it necessarily did not lie on the plaintiffs. The bailees, in such case, can much more easily give. affirmative proof of due diligence, than the bailors can of want of it. The mere non-production of the subject of bailment, is prima facie evidence of a deficiency in the care of it. (Platt v. Hibbard, 7 Cowen, 501. Newstadt v. Adams, 5 Duer, 46. Willard v. Bridge, 4 Barb. 367. Bush v. Miller, 13 id. 489. Van Horn v. Kermit, 4 E. D. Smith, 457. Arent v. Squire, 1 Daly, 347.) The plaintiffs are not driven to their special action on the case, but trover will lie. (2 Salk. 655.) In some cases cited on the argument to establish the opposite doctrine, no such question arose. (Knapp v. Curtis, 9 Wend. 60. Schmidt v. Blood, Id. 268. Foote v. Storrs, 2 Barb. 326.) In the case of Wiggins v. Hathaway, (6 id. 632,) the defendant received the property, if at all, as a public officer. There was no proof that it. ever came into his hands, or of any demand and refusal. The same rule is adopted in other states. (Alden v. Rearson, *420 5 Gray, 348. Beekman v. Sehouse, 5 Rawle, 189. Clarke v. Spencer, 10 Watts, 337. Logan v. Matthews, 6 Penn. Rep. 419. Cox v. O’Reilly, 4 Ind. Rep. 371.)
Some English cases cited in a note to Platt v. Hibbard, (7 Cowen, 500,) appear to sanction . a different doctrine. Thus, in Harris v. Packwood, (3 Taunt. 264,) where Lord Mansfield' seems to have held, that the ora¿s of proving due care did not lie with the defendant; who was sued, as a common carrier, for the loss of a parcel of over ¿620 value, when he had limited his liability by a notice, that he would not be answerable for any package above the value of ¿620, unless notified thereof and paid a premium of insurance above the price paid for its carriage, and the right so to limit his liability was acknowledged; the other justices (Heath, Lawrence' and Chambre) expressed no opinion on that point; but the last named (Chambre) placed his opinion upon the ground, that the defendant would not under his notice be liable at all. That doctrine was afterwards sustained by the Court of King’s Bench in the case of Marsh v. Horne, (6 B. & C. 322,) which cited the former case (Harris v. Packwood, ubi sup.) as authority for its decision. A similar decision was made in Clay v. Willan et al. (1 H. Bl. 298.) The editor of the second edition of Jones on Bailments, (Balmanno,) remarks, in a note thereon, (page 106, n. 40,) that in the last case (Clay v. Willan,) no proof was “ adduced of negligence or conversion of the parcel by - the defendants or their servants, and it would have been inconsistent with legal principles to have presumed ” a breach of trust. This corresponds with the language of Chief Justice Abbott, in the previous case, (Marsh v. Horne, ubi sup.) who says, “ a person may engage to place goods in a course of conveyance and delivery, .and yet not be answerable for their loss.” In other words, in such cases where- an actual loss is established, negligence of so gross a character must be proved as to warrant the inference of fraud or a conversion; and such seems to be the opinion of the anno-tator in Platt v. Hibbard, (ubi sup.)
*421 The defendants in this case ought to be estopped from raising any such objection, having excluded positive testimony of negligence offered by the plaintiffs, by their objection. (Manuf. and Traders’ Bank v. Hazard, 30 N. Y. Rep. 226.) There was, also, some positive proof in this case, however slight, of negligence on the part of the defendants, when the plaintiff rested, such as the nature of the place where the goods were stored, the facility of entering it, and its want of proper fastenings. It was left to the jury to determine, on those and other facts in evidence, whether or not the goods in question “ were taken away in consequence of some acts of negligence, of which” they had “other evidence than the.loss of the goods.” They were also instructed that they should find for the defendants, if they had “ exercised ordinary care on their part, or the loss occurred without negligence by them;” and no exception was taken to those parts of the charge. The jury must, therefore, be held to have passed definitely upon the question of negligence. The proof introduced on both sides, after the motion for dismissal of the complaint, sustaining their verdict, cured any error in the refusal to grant that motion. (Kent v. Harcourt, 33 Barb. 495.)
On the trial, the counsel for the defendants took an exception to a refusal of the judge to charge that “ if the goods were stolen by burglars breaking into the store at night through the scuttle, after it was closed for the night, the defendants are not responsible.” This wholly disregards the condition of the building, and ignores any precautions to be taken to render it safe against a forcible entry, and any duty in guarding it, and was, therefore, properly rejected. Exception was also taken to a refusal of the court to charge that “ if the goods were stolen by burglars entering through the scuttle in the night, ordinary care did not require that they should ascertain the best known methods of securing the scuttle against burglars, and securing it in that way;” also, “ that the degree of care required to be exercised by a railroad company, in providing the most *422 approved and best known inventions to prevent accidents to passengers, is greater than that required of the defendants in providing fastenings or inventions to prevent burglars from entering their store.” The court charged the jury that “ the warehouse keeper was liable, if he did not do what an ordinary storekeeper should do to take care of goods in his charge. * * In the first place, when goods are taken into a warehouse,” it “ must be properly built, so as to be secure against attacks by burglars, * * against all the attacks and dangers which commonly present themselves to a prudent man. You are not bound to set your wits to work in such case to see what further protection might have been used in regard to it, * * You are not to occupy .your time in endeavoring to find out in what form, the highest exertion of the most acute human intellect and experience would enable a man to devise means to protect goods in a warehouse against dangers. You are only to determine what a man would do, in the exercise of ordinary prudence, to protect his property.” Although considerable evidence was given on the trial as to the nature of the fastenings of the scuttle and other parts of the premises, not a particle was offered of any other special means, invention or device for securing such scuttle, as being an improvement on those actually employed; there was, therefore, nothing in the case to which the instructions asked for were applicable, and they would have been abstract propositions entirely outside of the case as made. A court is not bound, in instructing a jury, to negative every imaginable proposition that may be conceived to have some bearing on the case; but only those which the evidence warrants or .might naturally raise in the minds of the jury. The charge was also sufficient as to the general test of the degree of care to be exercised by the defendants. The request to charge that there was no evidence of gross neglect by the defendants or their servants was properly refused, as no such question was made in the case, and the court charged, in substance, that ordinary care was sufficient. No such *423 instruction was given to the jury as that the same evidence was necessary to establish a burglary in this case as on a trial for burglary, but only, that it was as much a matter of fact to he decided hy the jury, as on such a trial. The exception on that score was, therefore, properly overruled.
The requests to charge the jury in reference to the secuity of the building in question, compared with those of other stores in New York, Brooklyn and. New Jersey, in the vicinity, had no aliment in the evidence. They contained mere abstract propositions outside the ease, and were, therefore, properly refused. Indeed, the only attempt to introduce any evidence upon that point was defeated, in consequence of the generality and leading nature of the question proposed.
The interest on the value of the goods, (if allowed by the jury,) was properly allowed by way of damages, (Dana v. Fiedler, 12 N. Y. Rep. 51; Andrews v. Durant, 18 id. 502; Willard v. Bridge, 4 Barb. 368; Sherman v. Wells, 28 id. 403;) it being an action for a breach of duty. No instruction was given to the jury on that point. All the exceptions to the admission or rejection of evidence were properly overruled.
The judgment should be affirmed, with costs.