KINSTON COTTON MILLS v. KUHNE et al.

(Supreme Court, Appellate Division, First Department. December 18, 1908.)

1. FACTORS (§ 66*)—FACTORS ACT—PROTECTION OF PERSONS DEALING WITH FACTOR.

Evidence in an action by the seller of goods against bankers who had made advances to a factor handling the goods to recover for money received by the bankers in collecting from the purchasers of the goods considered, and *held* to show that defendants made their advances to the factor on the faith of bills of lading made out to the factor, and that under Factors Act (Laws 1830, p. 203, c. 179) § 3, making every factor intrusted with a bill of lading the true owner thereof so far as to give validity to any contract made by such agent with any other person for money advanced upon the faith thereof, the bankers were not liable to plaintiff.

[Ed. Note.—For other cases, see Factors, Dec. Dig. § 66.*]

2. FACTORS (§ 59*)—FACTORS ACT—CONSTRUCTION.

Factors Act (Laws 1830, p. 203, c. 179) § 3, for the protection of persons dealing with factors, enacts the common-law rule that, where one of two innocent persons must suffer loss from the act of a third person, such loss shall be borne by him who has placed the third person in the position which enabled him to do the act causing the loss, and must be liberally construed.

[Ed. Note.—For other cases, see Factors, Dec. Dig. § 59.*]

3. FACTORS (§ 66*)—ACTIONS—INSTRUCTIONS—"SUSPICION."

In an action by the seller of goods against bankers who had made advances to factors to whom plaintiff had consigned its goods by bills of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

lading made out to such factors to recover the proceeds of the goods, an instruction that, if defendants had a "suspicion" that the factors were not the owners of the goods, it was their duty to make inquiry of plaintiff and that defendants were bound by whatever knowledge such inquiry would have elicited, deprived defendants of the benefit of Factors Act (Laws 1830, p. 203, c. 179) § 3, providing that every factor intrusted with any bill of lading shall be deemed to be the true owner thereof, since the essence of a "suspicion" implies the absence of known facts.

[Ed. Note.—For other cases, see Factors, Dec. Dig. § 66.*

For other definitions, see Words and Phrases, vol. 8, p. 6835.]

4. PLEADING (§ 248*)—AMENDMENT OF COMPLAINT—NEW CAUSE OF ACTION.

The complaint in an action by the seller of goods against bankers who had collected the price of the goods after sale by a factor cannot be amended so as to make the action one for conversion or for an accounting.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 686–709; Dec. Dig. § 248.*]

Appeal from Trial Term, New York County.

Action by the Kinston Cotton Mills against Percival Kuhne and others. From a judgment for plaintiff, defendants appeal. Reversed.

Argued before PATTERSON, P. J., and LAUGHLIN, HOUGHTON, McLAUGHLIN, and SCOTT, JJ.

George T. Hogg, for appellants.

Edwin Blumenstiel, for respondent.

SCOTT, J. The defendant appeals from a judgment entered upon a verdict. The action is, or was before the amendment of the complaint hereinafter referred to, one for money had and received, and arose upon the following state of facts: The plaintiff is a foreign corporation engaged in the manufacture of cotton yarns. The defendants are bankers in the city of New York. The English-Greene Company was a corporation engaged in the business of buying and selling cotton yarns either as commission merchants for the manufacturers or as middlemen buying from the manufacturers and selling to consumers. In which capacity it acted with reference to the transactions out of which this action arose is one of the disputed questions of fact. On January 24, 1904, the defendants entered into an agreement with the English-Greene Company to make advances to the latter upon sales made by them. This agreement seems to have been a renewal, with some modifications, of a former contract of similar tenor. It provided, in substance, that the English-Greene Company might present to defendants invoices of goods sold to customers, made payable to defendants, with shipping proofs attached. If acceptable and accepted by defendants, they agreed to collect the amount of the invoices, to bear one-half the loss in case the customers should fail, and meanwhile to advance to the English-Greene Company not less than 80 per cent. of such invoices, charging interest upon such advances. There was an alternative provision, which does not enter into the present case, under which defendants agreed upon certain conditions to take up what are known as "mill drafts" drawn upon and accepted by the English-Greene Company. A considerable business was done between the English-Greene Company and the defendants; the advances by the

latter amounting at times to as much as $30,000. On January 18, and 19, 1904, following upon a correspondence between plaintiffs and the English-Greene Company, two orders were given by the latter company to plaintiff, which express the final result of their negotiations. The first of these orders reads as follows:

"No. 489.                                             January 18, 1904.

"Kinston Cotton Mills, Kinston, N. C.:  We confirm our order for 10,000 lbs. 20-1 Cones, Twist Hosiery, frame spun, Foster wind.  Price 24-25 cents per lb.  Terms less 2% and 5% 10 days.  F. O. B. Philadelphia.  Delivery 3,000 to 4,000 lbs. weekly at once.  Kindly acknowledge receipt of this confirmation by signing and returning detachable slip and oblige,

"Yours very truly,           English-Greene Co.

"Per James E. Mulgrew, Order Clerk.

"Approved by J. H. English, Manager Department."

The second order was similar in all respects except as to the amount, description, and price of the goods ordered. A number of shipments were made under these orders. There are involved in this action five shipments which were made under the first order and eight shipments made under the second. Pursuant to instructions given by the English-Greene Company, the bills of lading for 12 of these 13 shipments were made out to defendants; the thirteenth being made out to the English-Greene Company. All of the bills of lading were, however, forwarded by plaintiff to the English-Greene Company, together with an invoice, which was in each case in the following form:

"Kinston, N. C., Feb'y 3, 1904.

"English-Greene Co. New York City, N. Y., Bought of Kinston Cotton Mills, Spinners of Knitting Yarn.

"Order No. 491.

"Shipped to Knauth, Nachod & Kuhne, Orwigsburg, Pa.

"Freight prepaid.                                        Net."

Then followed the case, number, weight, price, and discounts.

On various dates between February 4 and 14, 1904, the English-Greene Company pledged to defendants under its contract with them invoices against customers to whom it had sold yarns shipped by plaintiff pursuant to the aforesaid orders, said invoices representing sales aggregating $2,771.87. These invoices were at somewhat lower prices than those at which the goods had been shipped by plaintiff; the reason being that the English-Greene Company had sold the goods before ordering them from plaintiff in the expectation of filling the orders with goods from another mill, which had, however, refused to deliver them. On some date prior to February 16, 1904, the plaintiff had drawn a draft on the English-Greene Company for $1,500 on account of the shipments made under the aforesaid orders, and on said February 16th plaintiff drew a further draft on the English-Greene Company on account of said shipments. Neither of these drafts were paid. On February 19, 1904, plaintiff sent to defendants a statement of account for the goods shipped to its order on request of the English-Greene Company, and requested payment of the same. Defendants replied, returning the account, and disclaiming all liability to plaintiff therefor. The plaintiff afterward sued the English-Greene Company and recovered judgment for the amount of the shipments under the foregoing orders, for which bills of lading had been made out to said

company. On March 18th proceedings in involuntary bankruptcy were instituted against the English-Greene Company. In those proceedings the plaintiff verified and filed two claims against the English-Greene Company one for the value of the goods for which bills of lading were made out to that company, and one for the value of the goods for which bills of lading were made out to defendants; the latter being the same claim sought to be recovered in this action. Defendants made efforts to collect the amounts due upon the invoices pledged to them by the English-Greene Company, but were largely unsuccessful, being able to collect only about 30 per cent. of the face value; the failure to collect being apparently due, not to the insolvency of the purchasers, but to the fact that many of them held valid counterclaims or offsets against the English-Greene Company. Finally, treating the accounts as having been pledged to them, defendants sold the accounts at auction for an insignificant sum. It is plain at the outset that it is very important to ascertain whether the plaintiff sold the goods to the English-Greene Company on credit, or whether, as is now claimed, it merely consigned them to the English-Greene Company for sale, as factor or commission merchant, retaining the title in itself. If the transaction constituted a sale on credit, the plaintiff would, of course, have no cause of action against defendants. The jury found on this question in plaintiff's favor, although it must be conceded that the evidence would at least have been consistent with a contrary finding. The orders given by the English-Greene Company were such as might be given by any purchaser, and contain no suggestion that the English-Greene Company is acting merely as a selling agent for plaintiff. Payment was to be made to plaintiff by the English-Greene Company in 10 days, and not when the latter company should have sold the goods and collected the proceeds, as would have been the natural agreement if the relation had been merely one of agency. The invoices made out by plaintiff to accompany each shipment represent the goods as having been "bought" by the English-Greene Company from plaintiff, and plaintiff's treasurer testified:

"The Kinston Cotton Mills looked for payment of these sales to the English-Green Company. As the goods were shipped, the English-Greene Company was charged on the books of the Kinston Cotton Mills. Previous to that the order of the English-Greene Company was entered in an order book, so that we had a record of the order. When shipments were made, the English-Greene Company was charged with the amount of each shipment. It was so entered in our shipping book and the price per pound was entered before the amount was figured out. The English-Greene Company appeared on the books of the Kinston Cotton Mills as its debtor. The Kinston Cotton Mills looked to the English-Greene Company for payment of the account."

He also testified:

"At that time, within the well-recognized custom of the trade, the Kinston Cotton Mills did not look towards the ultimate purchaser of the yarn, but looked towards the English-Greene Company."

Reading this testimony in connection with the orders and the invoices, strong ground is afforded for believing that the transaction amounted to a sale. It is true that the treasurer also says:

"The Kinston Cotton Mills expected that the goods were already sold. The understanding was from the telegrams and letters that the yarn had been sold for our account."

The telegrams and letters are in evidence; and, while they indicate that the English-Greene Company would not order yarns until it had itself procured an order therefor, there is nothing to indicate that it was acting merely as a sales agent for plaintiff. It does appear in the orders that there is to be an allowance of 5 per cent. "commission," which would be an appropriate word to use if the goods were consigned for sale, and apparently inappropriate if the transaction was a sale outright. It was testified to, however, that this allowance of commissions was a method in vogue for determining the net price, and that the same commission would be allowed if the sale had been made outright to a retailer, but not if made to a knitter or consumer. It certainly was the intention of plaintiff to confer upon the English-Greene Company such complete possession and power of disposition as was necessary to enable it to sell and deliver the goods to a purchaser, and in such case it is conceded that the plaintiff would look only to the English-Greene Company for payment, and could assert no claim therefor against the purchaser. It may be that between the plaintiffs and the English-Greene Company it was understood that the latter acted only as a factor, and not as a purchaser on credit, but it is clear that a stranger, knowing nothing of their relations except what was to be derived from the bills of lading and invoices, might be led to honestly believe that the English-Greene Company were purchasers upon credit to whom title to the goods was transferred. This is what the defendants claim they were led to believe and did believe, and they claim the right to shield themselves behind what is known as the "Factors Act," which so far as applicable reads as follows:

"Every factor, or other agent intrusted with any bill of lading, custom house permit or warehouse keeper's receipt for the delivery of any such merchandise * * * shall be deemed to be the true owner thereof so far as to give validity to any contract made by such agent with any other person for the sale or disposition of the whole or any part of such merchandise, for any money advanced * * * upon the faith thereof." Chapter 179, p. 203, § 3, Laws 1830; 2 Birdseye's Rev. St. (3d Ed.) p. 1415, § 1.

This statute has been much discussed by the courts in this state, and is deemed to be one to be liberally construed. Its purpose is to make certain and apply to commercial transactions the general common-law rule that, where one of two innocent persons must suffer loss from the act of a third person, such loss shall be borne by him who has placed the third person in the position which enabled him to do the act causing the loss. Cartwright v. Wilmerding, 24 N. Y. 521; Blydenstein v. N. Y. Security & Trust Co., 67 Fed. 469, 15 C. C. A. 14. Substantially this statute left the owner to use his precautions when he selected his factor, thereafter leaving him to be responsible for the acts of his agent, and protecting a bona fide third person in any transaction fairly effected with the apparent owner. Cartwright v. Wilmerding, 24 N. Y. 532. Following the terms of the statute, we find that the English-Greene Company, as agent of plaintiff, was "intrusted with the possession of the bills of lading for the delivery of" the yarn. These bills of lading were in every case sent to them. It is true that they were in all cases, save one, made out to defendants as consignees, but this was done at the request of the English-Greene

Company, and, so far from taking the case out of the statute, this circumstance served rather as a warning and intimation to plaintiff that the English-Greene Company were dealing with the property and perhaps obtaining advances thereon, for the treasurer of the plaintiff testified:

"At the time that the Kinston Cotton Mills had the name of Knauth, Nachod & Kuhne put upon certain bills of lading, I supposed that they were connected in some way with the English-Greene Company. I didn't know in what way. I didn't presume that they were the purchasers of the goods which were shipped or marked for them. I did not expect that they were. I did not know them as users of cotton yarn. * * * My expectation was that they had some financial connection with the English-Greene Company, but I did not know what it was."

The plaintiff therefore intrusted the English-Greene Company with the possession of bills of lading, made out to them or their nominees, for the delivery of the goods. Thus far the transaction comes clearly within the statute. Were the advances made "upon the faith thereof"? These words have received judicial construction. "I have therefore no doubt that 'on the faith thereof,' at the end of the third section of the New York factors act, means on the faith of the possession by the factor of the goods, or their evidence of title previously mentioned therein, with the owner's consent; that 'on the faith' means relying on them as evidences of authority to make the disposition made by the contract, in the absence of evidence or notice of anything to the contrary; that the mere notoriety or avowal of a person's business being only that of a factor is no proof of the precise authority of such factor in a particular case, nor is it a fact which would put the person dealing with such factor upon inquiry as to the precise nature of his authority, when that precise nature is immaterial, or make him assume at his peril the duty of proving it." Pegram v. Carson, 10 Bosw. (N. Y.) 505. See, also, Cartwright v. Wilmerding, supra; N. Y. Security & Trust Company v. Lipman, 157 N. Y. 551–562, 52 N. E. 595. That the defendants in fact made their advances upon the faith of the bills of lading is not to be doubted.

The next question is whether they had knowledge or notice that the true title was in plaintiff and that the English-Greene Company were forbidden to obtain advances thereon. Of actual knowledge or notice there is no proof. The court charged the jury that, if they found that defendants had sufficient facts at the time they made advances on said goods to arouse their suspicion as to whether or not the English-Greene Company were the owners of the goods or not, then it was the duty of the defendants to inquire of the plaintiff whether the plaintiff had any interest in said goods, and that the defendants were bound by whatever knowledge such inquiry would have elicited. This we think placed upon defendants a burden which the law does not warrant, and which, if sustained, would entirely nullify the purpose for which the factors act was passed. The essence of a "suspicion" is that it is without known facts to support it, and in every case where a person has apparent ownership of goods either through actual possession, or the possession of the muniments of title, there is room for a "suspicion" that some other person may have an interest therein.

Even under the original English act which was less liberal than our present act because it could not be availed of except by showing that the lender did not know that the factor was not the true owner, and thus cast the burden upon him of showing his lack of knowledge, Lord Tenterden said:

"A person may have knowledge of a fact either by direct communication or by being aware of circumstances which must lead a reasonable man, applying his mind to them, and judging from them, to the conclusion that the fact is so. Knowledge acquired in either of these ways is enough, I think, to exclude a party from the benefit of the provision of the statute. Slight suspicion I think will not." Evans v. Truman, 1 Moody & R. 10.

In that case he left it to the jury to say whether the circumstances were such that a reasonable man and a man of business, applying his understanding to them, would know that the goods did not belong to the pledgor. It was the duty of the plaintiff who had intrusted the English-Greene Company with the indicia of apparent ownership to take steps to protect themselves, especially after they had been advised by the request to consign them to defendants that the English-Greene Company were dealing with defendants with reference to the goods, and that defendants were not consumers, but bankers. Whatever duty of diligence there was in the case rested on plaintiff, not upon the defendants, who in the absence of notice or knowledge were entitled to rely upon the documentary evidence.

Another error was committed. The action, as has been said, was one for moneys had and received; its theory being that defendants had received plaintiff's goods and collected the proceeds of their sale, the purpose being to collect from defendants the amounts which they had received for the goods. It appeared upon the trial that defendants had been able to collect only a small proportion of the amount for which the goods were sold. Thereupon plaintiff was permitted to amend its complaint. The language of the amendment is a little obscure, but it was apparently intended and understood as changing the cause of action from one of moneys had and received into one for conversion or perhaps for an accounting, so that plaintiffs were permitted to recover for the whole price for which the goods were sold, and not alone for the amounts they were able to collect. If this was the effect of the amendment, and upon no other theory can the judgment for the whole value of the goods be sustained, it was clearly one which the trial court had no power to make, for it completely changed the form of action, raising different issues and calling for different proofs.

Upon the complaint as originally framed, the plaintiff could recover, in any event, only what the defendants had actually collected. It was that claim which the defendants were called upon to meet. Upon the amended complaint many other elements were involved which called for entirely different proofs. Our attention has been called to other alleged errors. Since there must be a new trial it will not be necessary to consider them.

For the reasons above stated, the judgment must be reversed and a new trial granted, with costs to the appellant to abide the event. All concur.

113 N.Y.S.—50