The First National Bank of Toledo, Ohio, Appellant, *v.* Leander B. Shaw et al., Respondents.

The provision of the factors' act (§ 3, chap. 179, Laws of 1830), providing that a factor or agent intrusted with the possession of a bill of lading shall, in certain cases, be considered the owner, so far as relates to contracts made by him with third persons acting on the faith thereof, applies only where the relation of principal and factor or agent exists between the real owner and the one having the bill in possession, where the latter obtains the bill by or with the consent of the owner, and where the bill is in the name of the factor; and it must also appear that money was advanced by such third person on the faith thereof.

Where an intermediate consignee named in a bill of lading, with power simply to receive and forward the property, without authority issues

and sends a new bill of lading to one not the consignee named in the original bill, the person so receiving such new bill does not thereby become the factor or agent of the owner, and the title of the latter is not affected by any contract made by the former for money advanced on the faith thereof.

A bill of lading executed in Ohio, of merchandise there shipped to be transported to a place in this State, which bill is delivered, in pursuance of a contract made in and by residents of Ohio, to one there making advances upon the faith thereof, and to secure drafts drawn for such advances on parties in this State, is an Ohio contract and is to be construed by and under the laws and commercial usages of that State.

Plaintiff, a corporation organized and doing business in Ohio, discounted for C. & C. two drafts drawn upon T. W. G. & Co., of New York, upon delivery as collateral of a bill of lading of a cargo of wheat which, in effect, stated that the wheat was shipped on account of plaintiff to K., P. & Co., of New York, to be held for it and subject to its order until payment of the advances, and then to be delivered to T. W. G. & Co., the wheat to be received at Buffalo by A. L. G. & Co., and by·them forwarded to destination. The wheat on its arrival at Buffalo was received by A. L. G. & Co., who transhipped it by canal, and issued a canal bill of lading, in substance like the lake bill, with the addition that the freights, charges, etc., were to be paid to Y. Bros. at place of destination. This bill was sent to T. W. G. & Co., or to Y. Bros. On the arrival of the wheat at New York, by the direction of T. W. G. & Co., it was unloaded at the warehouse of S. & Co., who, without receiving either bill of lading, gave to T. W. G. & Co. a warehouse receipt in their names therefor, and upon the faith thereof and the indorsement over of the same the latter firm obtained a loan of defendant, the N. Y. G. and I. Co. This company knew nothing of the relations of the parties to the property, and asked no questions. In an action to recover possession of the wheat, *held*, that T. W. G. & Co. were not, within the meaning of the factor's act, the factors or agents of plaintiff, and the title of the latter, under the original bill of lading, was not affected by their unauthorized dealing with the property; that defendants were not protected by the canal bill of lading, because they did not act upon the faith thereof, nor would they be if they had so done, as it showed upon its face plaintiff's title, and because plaintiff did not intrust T. W. G. & Co. therewith; and that defendants could not safely rely on the mere possession of T. W. G. & Co., but were bound to look into the shipping papers and were chargeable with constructive notice of their contents; nor could the N. Y. G. and I. Co. rely on the warehouse receipt, as it was not one intended by the factors' act, and if it were it was not intrusted by the owner to those from whom the company received possession.

Plaintiff forwarded the drafts and bill of lading to K., P. & Co.  T. W.

G. & Co., on presentation, paid one and accepted the other (a thirty-day draft). The wheat arrived in New York October sixteenth, the loan was made by the N. Y. G. and I. Co. on the seventeenth. K., P. & Co. made no inquiries for the wheat until after the maturity of the draft (which occurred on the twenty-ninth), and refusal of payment. *Held*, that their remissness, if any, did not affect plaintiff's rights; 1st. As the advance was made prior thereto, and defendants were not injured thereby ; 2d. As plaintiff had the title to and not a simple lien upon the property, its negligence or the negligence of its agents could not forfeit or affect such title.

Also, *held*, that it was not necessary to the maintenance of the action that the amount paid on the first draft should have been tendered back, as plaintiff's possessory right continued until its entire advance was paid.

(Argued May 28, 1874; decided September term, 1874.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, affirming a judgment entered in favor of the defendants upon a verdict, and affirming an order denying a motion for a new trial.

This action was for the claim and delivery of personal property.

The property in question was 7,700 bushels of Michigan amber wheat. The plaintiffs made claim to it, under the following circumstances :

T. W. Griffin & Co. were dealers in grain in the city of New York. Their correspondents at Toledo, Ohio, were Carrington & Casey, grain commission merchants, who purchased the grain in litigation. The property was purchased under an agreement between these parties that Carrington & Casey, or the bank that should discount the paper drawn for the purchase-money, should hold such property until the paper was paid. Two drafts were to be drawn for the price, one at sight, as a margin to cover any depreciation in value during transit; the other on time   On September 22, 1868, Griffin telegraphed to Carrington & Casey to buy a load of amber wheat, " at their quotation." The money for this purchase was obtained from the plaintiff, under an agreement that drafts should be drawn on Griffin & Co., for the amount loaned, and that the bill of lading of the wheat should be

given in the plaintiff's name as a security for their payment. The purchase-price was $15,945.80. Two drafts were given for this amount. There was a sight draft for $1,945.80, and another for $14,000, drawn on thirty days' time. They were drawn by Carrington & Casey, on Griffin & Co., in favor of the plaintiff's cashier. A bill of lading was given on the shipment of the wheat (September twenty-sixth), executed by the carrier. It stated that Carrington & Casey had laden upon the schooner Maize, bound for Buffalo, the described articles, to be delivered unto the consignees or their assigns, as marked and numbered in the margin. As these marks become material in the cause, they are set forth.

"Ac't S. S. Hubbard, Cash.     7,700 bushels Amber Mich. wheat.

"Care Kidd, Pierce & Co., New York.
    " A. L. Griffin & Co., Buffalo.     C. C. & R. fr't five cents pr. bush.
"B'k ac't to T. W. Griffin & Co.
                       "JOSEPH SKELCHER."

The bill of lading and drafts were accompanied by insurance certificates. All of these documents were delivered, on September twenty-sixth, by Carrington & Casey to the plaintiff. They were mailed on the twenty-eighth to Kidd, Pierce & Co., in New York, with an accompanying letter of advice. This directed the property to be delivered only on payment of the draft of $14,000. The papers reached New York on or before October first. The sight draft was paid, and the time draft of the same date was presented for acceptance and accepted. It remained in the possession of Kidd, Pierce & Co., together with the bill of lading and insurance certificates. When the schooner Maize arrived at Buffalo the cargo was delivered to A. L. Griffin & Co.; they shipped it to New York upon the canal boat "Hulbert;" a canal bill of lading was executed by A. L. Griffin & Co.; it provided for the transportation of the property to the place of destination without unnecessary delay, and its delivery to the consignee upon payment of freight and charges. Three days were

allowed for unloading, and after that demurrage was to be paid. The bill contained the following clause : " The freight charges and demurrage payable to Young Bros., or order, at place of destination, who are the only party authorized to collect the same, and whose receipt shall be in full of all demands on this cargo or bill of lading; " also the following :

| | | |
|---|---|---|
| " Ac't S. S. Hubbard, Cash. | 7,700 bush. Amber Mich. wheat, ex. sch. Maize. | |
| " Care Kidd, Pierce & Co., | Lake frt. 5c. | $385 00 |
| | Storage 1¾ | 134 75 |
| " B'k ac't to T. W. Griffin & Co. | Our ch'gs. | 19 27 |
| | | $539 00 |

" Fr't to New York 17½c.

" A. L. GRIFFIN & Co.<br>" Perry."

This bill of lading was sent either to T. W. Griffin & Co. or to Young Bros., of New York. The Hulbert arrived at New York on October sixteenth. By the direction of T. W. Griffin it was unloaded on that day at the warehouse of Shaw & Co., who were warehousemen in Brooklyn. They gave to Griffin & Company the following warehouse receipt : " Brooklyn, October 16, 1868. Received, in store No. 92, floor No. 2, sections Nos. 1, 2, and 4, from Messrs. T. W. Griffin & Co., per boat P. L. Hulbert, seventy-seven hundred 14/60 bushels wheat. Shaw & Co."

" The merchandise covered by this receipt is deliverable only on return hereof, properly indorsed, with all charges paid. New York office, No. 5 Water street."

T. W. Griffin & Co., on October seventeenth, indorsed this receipt in blank, and delivered it to defendant, the " New York Guaranty and Indemnity Company." That company, on the faith of it, made a loan of $14,000 to said T. W. Griffin and Co., by whom an agreement was entered into, which set forth that the borrowers had confided to the management, custody and charge of the company the wheat in controversy, belonging to them (Griffin & Co.), on which had

been advanced $14,000, and that they promised to refund such advance, with interest, within thirty days ; and that the company were to have a lien, prior to all other claims, upon the property or its proceeds, to secure the advances, charges and commissions. There was also an authority to sell the property in case default was made in payment.

It did not appear that either Shaw & Co. or the Guaranty and Indemnity Company knew any thing of the relations of T. W. Griffin & Co. to the property. Shaw & Co. gave the warehouse receipt to Griffin & Co. because that firm sent the boat there. It was their custom to give warehouse receipts to any one who sent boats to them. The Guaranty Company made the advance simply on the production of the warehouse receipt without asking questions. This was their usual custom where they had no reason for suspicion. The draft for $14,000 matured October twenty-ninth. It was then presented to Kidd, Pierce & Co. for payment, with the original bill of lading attached. Payment was refused, and the draft protested. Griffin & Co. were, at the time, insolvent. No notice had been given Kidd, Pierce & Co. of the arrival of the grain, and they were ignorant of its situation. The bank, after the protest, traced, through other sources, the grain to the warehouse of Shaw & Co. On October 31, 1868, while the indebtedness to it still remained unpaid, it commenced this action both against Shaw & Co. and the Guaranty Company, to obtain possession. The grain was taken from the possession of Shaw & Co. without making any demand from the Guaranty Company.

The defendants claimed, at the trial, that there was ambiguity in the expressions used in the canal bill of lading tending to mislead, and which did, in fact, mislead Young Brothers, and induced them to give the possession of the wheat to Griffin & Co. Witnesses familiar with the business of transporting grain between Toledo and New York, testified that the papers used were commonly employed in such transportation where the property was pledged to a bank. They explained, under objec-

tion (no exception, however, appearing in the case), the terms used as follows : In the original bill of lading from Toledo, the entry " acct. S. S. Hubbard, cash.," means that the property is to be transported for account of the bank of which S. S. Hubbard is cashier. " Care Kidd, Pierce & Co., New York," means that the grain is to be shipped to them for account of the plaintiff, and that they are to hold the same for account and subject to the order of the bank. The entry " A. L. Griffin & Co., Buffalo," means that the property goes through them as forwarders at Buffalo. The phrase " b'k acct. to T. W. Griffin & Co.," means that the bank derives its title by virtue of some transaction in which T. W. Griffin & Co. are interested. The same general explanation was given of corresponding entries on the canal bill of lading.

The explanation given by the plaintiff's cashier was in these words : The first entry shows the name of the cashier of the bank holding the property in pledge ; the second entry shows the correspondent of said bank who is to receive the property at the point to which it is shipped ; the third entry shows the forwarder at Buffalo who is to attend to the transhipment at that point; and the fourth entry shows the party who is to pay the debt for which the property is pledged, and after such payment to receive the property from the bank's correspondent.

Evidence was offered at the trial tending to show that the parties had many previous transactions of a similar character. Kidd & Pierce never made inquiry in any such cases to learn when the grain so shipped arrived, nor as to what became of it on arrival, nor as to the time consumed in transit. They did nothing until the maturity of the drafts, nor did they read the bills of lading. They had reason to suppose that cargoes sometimes arrived before the maturity of the drafts. In the previous shipments no notice had been given them of the arrival of the cargoes. The course of business had been, that upon the payment of the paper by Griffin & Co., at maturity, the bills of lading had been indorsed over and delivered by the consignees without any previous effort, on

their part, to learn where the goods were, or the length of time used in transportation. It was claimed that this evidence established the course of dealing between the parties, and tended to show negligence on the part of the consignees. This the defendant urged extinguished the claim of the plaintiff, which it was insisted was but a lien.

The judge at the trial directed a verdict for the defendants.

*Edward Bissell* for the appellant. Plaintiff's right to judgment cannot be prejudiced by the fact that it held title to secure the payment of a debt; it must be considered to have owned the goods when they left Toledo. (*City Bk.* v. *Rome R. R. Co.*, 44 N. Y., 136–139; *Rawls* v. *Deshler*, 3 Keyes, 572–577; *Bk. of Roch.* v. *Jones*, 4 Comst., 497, 506, 508.) If Griffin could convey no title by the manual delivery of the goods, he could give no validity to the transaction by storing with a warehouseman and transferring the receipt. (*F. Sewing M. Co.* v. *Warford*, 1 Swe., 444; 2 R. S. [5th ed.], 456, § 8.) The designation of Griffin & Co. as consignees, at Buffalo, would not give validity to their attempt to impair plaintiff's title. (3 R. S. [5th ed.], 77, § 6; *Wilson* v. *Nason*, 4 Bosw., 156, 166, 168; *Cook* v. *Adams*, 1 id., 500, 505.) It was error to hold that plaintiff's title was lost through the neglect of Kidd, Pierce & Co. (*Anderson* v. *Nichols*, 5 Bosw., 121; *Stevens* v. *Hyde*, 32 Barb., 178; *Malcom* v. *Loveridge*, 13 id., 378, 379; *Blossom* v. *Champion*, 37 id., 554, 563; *Keyser* v. *Harbeck*, 3 Duer, 392; *Padden* v. *Taylor*, 44 N. Y., 371, 376; *Williams* v. *Chapin*, 11 Wend., 80–82; *Hoffman* v. *Carew*, 22 id., 295, 318; *Redmond* v. *Liverpool Co.*, 46 N. Y., 578; *McDonald* v. *West. R. R. Co.*, 34 id., 501; *Cook* v. *Erie R. Co.*, 58 Barb., 312; *Solomon* v. *Phila. Co.*, 2 Daly, 104; *Hedges* v. *H. R. R. R. Co.*, 6 Robt., 119, 120; *Zinn* v. *N. J. Stbt. Co.*, 49 N. Y., 442; *The Thames*, 14 Wall., 108.) Defendants were not *bona fide* purchasers. (*City Bk.* v. *Rome R. R. Co.*, 44 N. Y., 141.) The carrier had no right to warehouse. No lien was created. (*Zinn* v. *N. J. Stbt. Co.*, 49 N. Y., 442; *Taylor* v. *Spader*,

48 id., 664.) Demand and tender were unnecessary. (*Holbrook* v. *Wright*, 24 Wend., 169.)

*George W. Parsons* for the respondents. The Guaranty Company was a *bona fide* purchaser. (*Cassell* v. *Dows*, 1 Bl., 335; *Bk. of Mich.* v. *Ely*, 17 Wend., 508; *Downer* v. *Thompson*, 2 Hill, 137; 6 id., 208; *Barney* v. *Worthington*, 37 N. Y., 112; *Rodgers* v. *Phillips*, 40 id., 519.) As between plaintiff and the Guaranty Company, the delivery to Griffin & Co. was sufficient to enable them to vest an innocent purchaser with a good title. (*Lickbarrow* v. *Mason*, 1 Smith's L. C., 1043; Story on Ag., § 452; *Root* v. *French*, 13 Wend., 571; *Weed* v. *Panama R. R. Co.*, 17 N. Y., 362; *Rawls* v. *Deshler*, 3 Keyes, 572; *N. R. Bk.* v. *Aymar*, 3 Hill, 262; 16 N. Y., 154; 26 id., 505; 34 id., 67; *Ballard* v. *Burgett*, 47 Barb., 646; 40 N. Y., 314.) A warehouse receipt is transferable by indorsement and delivery, and gives title to a *bona fide* innocent holder. (2 R. S. [5th ed.], 456, § 6; *Birdsall* v. *Russell*, 1 Robt., 538; 29 N. Y., 220; *Bk. of Rome* v. *Vil. of Rome*, 19 id., 20; *Dows* v. *Greene*, 24 id., 638; *Blossom* v. *Champion*, 28 Barb., 217; *Brainard* v. *N. Y. and H. R. R. Co.*, 25 N. Y., 496; *Hoffman* v. *Carrow*, 22 Wend., 292; *Parker* v. *Patrick*, 5 T. R., 175; *Morey* v. *Walsh*, 8 Cow., 238; *Peer* v. *Humphrey*, 1 H. & W., 28; *W. Tr. Co.* v. *Marshall*, 6 Abb. [N. S.], 280; 37 Barb., 509; *Root* v. *French*, 13 Wend., 570; *Malcolm* v. *Leveridge*, 13 Barb., 372; *Keyser* v. *Harbeck*, 3 Duer, 373; *Wood* v. *Rawcliffe*, 6 Hare, 183, 191; *Beavins* v. *Lane*, 6 Duer, 232; *Smith* v. *Lyons*, 1 Seld., 41; *Durbrow* v. *McDonald*, 5 Bosw., 130; 39 N. Y., 233; *Ballard* v. *Burgett*, 47 Barb., 646; 40 N. Y., 314.) Defendants are protected by the factors' act of 1830. (3 R. S. [5th ed.], 76, § 1; *Dows* v. *Greene*, 24 N. Y., 639; 16 Barb., 72; 32 id., 490; *Dows* v. *Rush*, 28 id., 157; *Dows* v. *Perrin*, 16 N. Y., 325.)

Dwight, C. The plaintiff in this case under the bill of lading executed at Toledo, had the legal title to the property.

True, it held this not as absolute owner, but to secure its advances, the ultimate interest appertaining to Griffin & Co., still, the title was in the plaintiff. So long as the advances were not paid, there was no theory whereby Griffin & Co., could claim title. It had never been in them. At the moment their interest, whatever it was, accrued to them, it came to them burdened with the formal ownership of the plaintiff. The bank held the title in trust for Griffin & Co., after its own claim was satisfied.

This would be the result of the transaction as between the parties, even though no bill of lading had been executed. (*Bank of Rochester* v. *Jones*, 4 N. Y., 497.) The bill of lading was merely an instrument to carry out the true intent of the transaction, as evinced by their dealings.

Before entering in detail into the question of the plaintiff's title, it is important to notice whether the bill of lading was drawn in such a way as to accomplish the parties' intent, or whether it was in any proper sense of the term ambiguous. Instruments of this kind are familiar to the legal profession, and the construction of some of the clauses in the one under consideration has been settled ever since the case of *Dows* v. *Perrin* (16 N. Y., 325 [A. D. 1857].) In that case, there were bills of lading of corn by two canal boats, to the care of Dows & Carey, for account of one Mack. The court said that this language vested the title in Mack. The regular method of setting forth his title, as the consignee or party entitled to control the goods on their arrival, would have been for the owner who shipped it to have indorsed the bill, making the corn deliverable to him or his order. This, however, was done in substance by stating upon the face of the paper that the shipment was made on his account. When the document thus prepared was delivered to Mack, it purported to be a transfer from Niles & Wheeler (the consignors) to him of the corn, and to be a contract on the part of the proprietors of the transportation line to carry it to New York, and deliver it there to Dows & Carey, according to his directions, for the price of freight mentioned in it. (P. 329.) *Dows* v. *Greene*

(24 N. Y., 638, 640 [A. D. 1862]), reiterates this ruling under an instrument having substantially the same terms as were employed in the case at bar. The effect of these words showing that the title was in the bank, and that Kidd, Pierce & Co., and A. L. Griffin & Co., were its agents, was not changed by the fact that there were additional words, " B'k a|c to T. W. Griffin & Co." There is nothing in those words on their face to show that the title was in Griffin & Co. As far as they can be interpreted by a mere perusal of them, and considering the abbreviations to mean " Bank account," they refer to some relation between the bank and Griffin & Co., and not to any dealings between the owners of the grain and the bank. Evidence, however, was given to explain the commercial meaning at Toledo, Ohio, of the words, the result of which was that they were a mere notation to show that the bank held title to secure the payment of a debt due from Griffin & Co. It was objected by the defendants that this evidence was not legitimate, on the ground that this was not an Ohio but rather a New York contract. The advance of money was made in Ohio, the transfer of the grain took place there, and the bank, as between itself and the persons with whom it dealt, Carrington & Casey, were entitled to repayment there. The drafts on Griffin & Co., and the bills of lading, were merely a mode of reimbursement. The contract is, in substance, an Ohio contract. (Story on the Conflict of Laws, § 287.) It is there laid down that when advances are made in such a case, the undertaking is to replace the money at the same place at which the advances are made, even though the mode of reimbursement be by drafts on a foreign country. (*Lanusse* v. *Barker*, 3 Wheat., 101, 146 ; *Grant* v. *Healey*, 3 Sumner, 523 ; *Boyle* v. *Zacharie*, 6 Peters, 635, 643, 644.) In the more general case, where a contract is made in one country and to be performed in another, it is not always easy to determine, according to the authorities, whether the interpretation of words is to be governed by the law of the place where the contract is made, or by that where it is to be per-

formed. The general principle is, that the law of the place where the contract is made is to govern, unless it is positively to be performed elsewhere. The fact that acts are to be done abroad under a contract does not necessarily make it a contract to be performed there, in a legal sense. Thus, it has been said that a policy of insurance executed in England on a French ship for a French owner, on a voyage from one French port to another, is to be interpreted as an English contract. (*Don* v. *Lippmann*, 5 Cl. & F., 1, 19.) The true inquiry is, what was the intent of the parties. It would seem that in a case like the present, where the contract was made in Ohio, by Toledo parties, the money being advanced there and the security there, that they had in view, in employing words, their own usages, even though the goods were to be sent to another State, and ultimately sold there if the advances were not repaid. The result is, that the bill of lading executed at Toledo was intended to vest the title in the grain in the plaintiff; that A. L. Griffin & Co. were its agents to forward the cargo to New York; that Kidd & Pierce were its agents in New York to receive the goods, and that when the advances were repaid the bills of lading were to be assigned to T. W. Griffin & Co.

The authorities clearly sustain these conclusions. (*Bank of Rochester* v. *Jones, supra; Haille* v. *Smith*, 1 Bos. & Pull., 563; *Tooke* v. *Hollingworth*, 5 Term R., 215; *Allen* v. *Williams*, 12 Pick., 297; *City Bank* v. *Rome, W. and O. R. R. Co.*, 44 N. Y., 136; *Rawls* v. *Deshler*, 3 Keyes, 572.) The subject is set forth in a clear light in the case of *Haille* v. *Smith* (*supra*). In that case a cargo was consigned to bankers, to secure them for advances, and a bill of lading indorsed to them. It was also understood that the cargo was to be sold for the account of the consignors, who received the advances. Subsequent to the consignment the bankers applied for directions respecting the disposal of the cargo, and the price to be asked. The court held that this arrangement did not create the relation of principal and factor, but that the bankers held the title in trust to effectuate the intent of the

parties.   The consignors had a residuary interest so as to
gain by a rise or lose by a fall of the market value of the
goods.   This fact, however, only related to the mode in
which the trust was to be carried into execution.   The title
to the cargo was in the bankers, who had the evidence of it
in the bill of lading, which was itself upheld ·by the valuable
consideration paid for the transfer.

*Bank of Rochester* v. *Jones* is to the same effect, though
the apparent title was not so clear as in *Haille* v. *Smith.*
In that case one Foster applied to a bank to borrow $950
for the purpose of buying 200 barrels of flour, and proposed
to leave a forwarder's "receipt" for the flour so purchased,
as security for the acceptance of a draft to be drawn on the
defendant, Jones.   This proposition having been accepted,
the "receipt" was delivered, and purported that the for-
warder was to forward 200 barrels of flour to B. P. Jones,
Albany.   The proceeds of the draft, as discounted by the
bank, were paid over to the seller of the flour.   It was
the understanding that if Jones accepted the draft, the
"receipt" was to be made over to him.   Jones declined
to accept the draft, but got possession of the flour.   In an
action of trover brought by the bank against Jones, the
question was, whether it had such a property as to maintain
the action.   It will be observed that there was no bill of
lading in the bank's name.   The receipt was drawn in favor
of Jones.  ˙The title of the bank did not rest upon any form,
but on the substance of the transaction.   After deciding that
Jones had no title under all the circumstances of the case,
the court held that the bank had either the special or general
property in the flour.   It said: " The true ground on which
to sustain this transfer of property to the bank, is by regard-
ing the transaction as a *sale to the bank in trust,* to deliver
the property to Jones in case he accepted the draft, and
if he refused to accept the draft, then to sell the flour and
retain out of the ˙proceeds the amount of the draft, and to
pay the surplus to Foster."   (P. 302.)   The case of the *City
Bank* v. *R., W. and O. R. R. Co.* follows the case just cited,

and holds that the delivery of a bill of lading by an owner, with intent to pass the title, actually passes it, whether drawn to " assigns " or not, and if drawn to " assigns," whether it be indorsed or not.  In this case again, the substance of the transaction is regarded rather than the form. The only material point is, whether there was an intent to pass the title to the goods for a consideration.  The intent may be either to pass it absolutely or conditionally, or in trust. Whatever the intent may be, the court will carry it into effect. Following these authorities, it is necessary to hold that when the goods were shipped at Toledo the plaintiff held the title to the grain included in the bill of lading, charged with a trust in favor of T. W. Griffin & Co., to whom it was to be made over, if they accepted and paid the drafts drawn against it.

It is now necessary to examine the acts of A. L. Griffin & Co., at Buffalo.  It is plain that it was the intent of the parties that the grain should be transhipped at Buffalo to New York.  This is shown by the Toledo bill of lading, as well as by the known course of business.  The words " care A. L. Griffin & Co." made those parties consignees at Buffalo, only provisionally, and as incidental to the main object of the transit, which was to end in New York.  Their authority was limited by the object sought to be accomplished.  It was, in writing, disclosed on the face of the bill of lading, and, according to well settled principles, must be strictly pursued. Their whole power was to forward the goods to the same consignees on the same terms as stated in the Toledo bill of lading.  On the face of the canal bill of lading, it was apparent that the grain had come to Buffalo by way of the lakes ; and any one taking that bill would be put upon inquiry as to the authority of A. L. Griffin & Co.

But, without pursuing this line of inquiry, it is enough that the canal bill of lading did not differ, in substance, from the Toledo bill.  It mentioned the same consignees, the same owners, the bank, and had the same memorandum as to the interest of T. W. Griffin & Co.  The statement that the

" freight charges and demurrage were payable to Young Brothers," etc., was of no material significance. That only showed with whom the freight was to be settled on behalf of the carriers. It cannot be considered that any holder of the grain could possibly be misled by an entry, the object of which was so plain and unequivocal: In the aspect of the case most unfavorable for the plaintiff, there were indications on the canal bill which, under the rulings in *Dows* v. *Perrin* (*supra*), and in *Dows* v. *Greene*, were sufficient to lead to the conclusion that the plaintiff had an interest, and to put any person who took the goods upon inquiry as to its rights. Griffin & Co., accordingly, had no right whatever to meddle with the grain, or to warehouse it. The entire control was vested in Kidd, Pierce & Co. for the use of the plaintiff. The warehousemen, Shaw & Co., were bound to inquire whether a bill of lading accompanied the shipment. Their custom to make no inquiries but to warehouse grain for any one who had the possession could not, in any respect, prejudice the rights of the plaintiff. Having warehoused it, they were bound to hold the grain for the rightful owner. (*City Bk.* v. *R., W. and O. R. R. Co.*, 44 N. Y., 141.) Their receipt given for the grain was no protection to the Guaranty and Indemnity Company. Shaw & Co. simply trusted to a person having the naked possession, without any title or *indicia* of it. If on that bare possession they issued evidences of title, they were mere waste paper, under which the Guaranty Company can make no claim. A mere possessor cannot confer ownership by falsely asserting, through bills of lading or warehouse receipts, that he has a title. (*Saltus* v. *Everett*, 20 Wend., 267.)

It is, however, claimed on the part of the company, that it is protected by the provisions of the so-called factors' act. Before considering the terms of that act it will be proper to notice the rules of the common law as to the power of factors and others having possession of the goods of third persons, having documentary evidence of title to such goods, to pledge them. This rule has been tersely stated by Baron Parke

(Lord WENSLEYDALE), in *Phillips* v. *Huth* (6 M. & W., 596). He said: "Before the passing of the factors' act, it was clearly settled that a factor or agent for sale had no power to pledge whether he was in possession either of the goods themselves or of the symbol of the goods, and even though the symbol might bear on the face of it some evidence of the property being in himself, as in the case of a bill of lading in which he was consignee or indorsee. This was in accordance with the general rule, that he who deals with one *ex mandato*, can obtain from him no better title than his mandate enables him to bestow.

However logical this rule may have been, it was found in practice to bear hard on the interests of commerce. To remedy some of the inconveniences caused by it, the English Parliament enacted a number of statutes. (4 Geo. IV, c. 83; 6 Geo. IV, c. 94 [commonly known as the factors' act]; 5 and 6 Vict., c. 39.) The New York act with some modifications, is a reproduction of that of 6 George IV.

In so far as these statutes have not changed the law, the former rule, of course, prevails; and the holder of the goods of another, with or without documentary evidence of title, has no greater power to pledge them than they confer. (*Patterson* v. *Tash*, 2 Strange, 1178; *Daubigny* v. *Duval*, 5 Term R., 604; *Lamb* v. *Attenborough*, 1 Best & Smith, 831.)

There are two sections of our "factors' act" to be considered in their relations to the present case, the first and the third. The first provides that every person *in whose name* any merchandise shall be shipped, shall be deemed the true owner so far as to entitle the consignee of *such* merchandise, acting in good faith, to a lien thereon (1), for any money advanced or negotiable security given by such consignee for the use of the person in whose name the shipment is made; and (2), for any money or negotiable paper received by the person in whose name such shipment shall have been made for the use of the consignee. It is plain that this section has no application to the present case, as it has been shown that

the shipment cannot be deemed to be made in the name of
Griffin & Co.

The third section of the act provides that every factor or
other agent *intrusted* with the possession of any bill of
lading, custom-house permit or warehouse keeper's receipt
for the delivery of any " *such* " merchandise (referring to the
first section); and every such factor or agent not having the
documentary evidence of title, who shall be intrusted with
the possession of *any* merchandise for the purpose of sale or
as security for any advances to be made or obtained thereon,
shall be deemed to be the true owner thereof so far as to give
validity to any contract made by such agent with any other
person, for the sale or disposition of the whole or any part
of such merchandise, for any money advanced, etc., by such
other person on the faith thereof. (Laws of 1830, chap.
179.)

It is urged by the defendants that the fact that the forward-
ing house at Buffalo sent the canal bill of lading to T. W.
Griffin & Co., brings the case at bar within this section.

To sustain this view, it is necessary to show that Griffin
& Co. were factors or agents, that they were " intrusted "
with the bill of lading for the delivery of *such* merchandise
as was provided for in the first section, and that an advance
was made to them on the faith of the document with which
they were intrusted.

It needs no argument to show that Griffin & Co. were
not factors of the plaintiff. The statute presupposes that
the relation of principal and factor already subsists when
the trust or confidence is reposed in him. In other words,
the relation of factor is not created by the mere possession
of the instrument, though that may raise a presumption when
in the alleged factor's name, otherwise the relation is to be
proved *aliunde*. (*Cook* v. *Beal*, 1 Bosw., 497.) Nor can
Griffin & Co. be regarded as agents of the plaintiff. No
power was given in the lake bill of lading to make them the
agents of the plaintiff, and if the Buffalo house, without
authority, sent the canal bill of lading to them, they did not

thereby become agents, since that relation could only be created by the act of the plaintiff. (*Lamb* v. *Attenborough*, 1 Best & Smith, 831.)

It cannot be claimed that Griffin & Co. were intrusted with the possession of the merchandise. If "intrusted" with any thing, it must have been with the bill of lading. It is accordingly necessary to give a construction to the statutory words "intrusted with the possession of a bill of lading of any such merchandise," etc.    The word "intrusted" here implies confidence reposed. If the bill had been stolen there would have been no intrusting. The consent of the owner is necessary. True, it may be obtained by fraud. (*Sheppard* v. *Union Bank of London*, 7 H. &. N., 661; *Dows* v. *Greene*, 24 N. Y., 638.) But it must in some form be had. There was here no trust by the owner; the lake bill of lading gave no authority to A. L. Griffin & Co. to repose any confidence in T. W. Griffin & Co. Again, the same word "intrusted" refers to a bill of lading *in the name* of the factor or other agent. This is assumed in all the English cases. It was expressly so defined in the first factors' act (4 Geo. IV, § 1). The court, in *Phillips* v. *Huth* (*supra*), said: "The first section of the act shows that the word 'intrusted' was not unimportant, and was advisedly introduced, for it provides that the person *in whose name the goods shall be shipped* shall be deemed to be intrusted therewith for the purposes of the act, unless the contrary thereof shall appear or be shown in evidence by the person disputing the fact." (Page 596.) This construction is strengthened by the words "such merchandise." The language is that every factor, etc., intrusted with the possession of any bill of lading, etc., for the delivery of any "such" merchandise (referring to the first section), * * * shall be deemed to be the owner thereof. On examining the first section, it is found to apply only to cases where the merchandise is shipped *in the name* of the person who assumes to control it. (*Cartwright* v. *Wilmerding, infra*.) On the other hand, when the case of a factor, etc., not having any documentary evidence of title

but having possession, is provided for in the statute, the word "such" is omitted, and the word "any" is substituted in its place. Section third thus provides for two entirely distinct classes of cases : one, where the factor, etc., has documentary evidence of *such* merchandise as is referred to in the first section, running to himself; the other, where he is intrusted with the possession of *any* merchandise whatever, for the purpose of sale. In the first of these cases, the evidence must be complete, pointing to himself as owner, and with no notice by the bill of lading or otherwise, that he is not the actual and *bona fide* owner. (See section second and *Cartwright* v. *Wilmerding*, 24 N. Y., 521; *Bonito* v. *Mosquera*, 2 Bosw., 401.)

Moreover, the defendant, the Guaranty Company, did not advance the money to Griffin & Co. *on the faith* of the bill of lading, etc. This is one of the requirements of the factors' act. (*Jennings* v. *Merrill*, 20 Wend., 9.) It acted on the warehouse receipt of Shaw & Co., which was itself issued without any reference to documentary title, and relying only on the manual and unauthorized possession of Griffin & Co. Even if the bill of lading had been before the defendant, it could not properly be said to act on the faith of it, as it would have had constructive notice that the goods were not "intrusted" to Griffin & Co., not being in their names. (*Bonito* v. *Mosquera*, 2 Bosw., 401 ; *Pegram* v. *Carson*, 10 id., 505 ; *Cartwright* v. *Wilmerding*, 24 N. Y., 533.) The only explanation consistent with good faith that can be given of the possession by Griffin & Co. of the canal bill of lading is, that they were mere bailees of it to hand to Kidd, Pierce & Co., or that they received it by mistake. There was no evidence to show fraud or collusion on the part of the Buffalo house, and these are not to be presumed. Nothing could be more contrary to established and elementary principles than to hold that a mere bailee of a bill of lading, such as a finder or depositary, having no apparent title to it, could make a valid transfer of it or create a lien upon the goods which it represents, in favor of a third person who might make

advances to the possessor, with or without knowledge of the actual state of facts.

The defendants take an additional ground. It was urged that the plaintiff has lost his rights under the bill of lading "through his negligence in not observing the arrival of the canal boat." It is not perceived how any remissness subsequent to the advances made by the Guaranty Company would affect the plaintiff's rights. Whatever interest the defendant acquired accrued on the seventeenth of October, when the advance was made. The boat arrived on the sixteenth. This theory of negligence must rest on the view that the plaintiff's claim was a mere lien. It has already been shown that this was not the case, but that the plaintiff had the title. The court below laid some stress on the fact that the plaintiff's cashier stated in his testimony that the transaction was a pledge. His version of a transaction entered into by written instruments is not binding on the court. However, even if the transaction constituted a pledge, the rule which holds that a mere lienor may lose his lien by negligence, etc., is not applicable. A pledgee has something more than a mere lien. He has a property in the goods and not simply a right to hold them as in the case of a lien. The negligence of the plaintiff, under the circumstances, is wholly immaterial. The rights of the defendants depend on the question whether Griffin & Co. were in any form held out by the owners as entitled to control the grain. That point can only be determined by the fair construction of the bill of lading. If the Guaranty Company saw fit to act on the so-called warehouse receipt, which itself had no solid foundation, it acted at its peril. It should have inquired into the title and have examined the documentary evidence accompanying the shipments of the grain. (*City Bank* v. *R.*, *W. and O. R. R.*, *supra.*) It cannot shield itself from this obligation by imputing negligence to the plaintiff, which was not bound towards mere strangers to be diligent in looking after its property while in the possession of the carrier. Even if there was some evidence of negligence, it depended

so much on a variety of circumstances that it should have been left to the jury to determine whether the plaintiff had been guilty of it. Without dwelling upon this point, it is enough to say that the question of negligence does not enter into the case.

The defendant further claims, that as Griffin & Co. had paid for the grain, on account, $1,945.80, and as the Guaranty Company had acquired Griffin's interest, it was absolutely necessary to the maintenance of this action that this amount should have been tendered by the plaintiff. This is a misconception. If Griffin & Co. had detained the property, no such payment would have been necessary, as the possessory right of the plaintiff would have continued superior to that of Griffin & Co. until the entire debt was paid. The Guaranty Company, standing in Griffin's position and acquiring his rights, can have no greater claim.

The court below were requested to instruct the jury that as far as the defendants were concerned, if a verdict was rendered in their favor, the value of the property should only be assessed at the advances made by the Guaranty Company, and interest. This instruction was refused under exception, and an instruction was given that the entire value of the property should be found. This ruling was erroneous. In any aspect of the case, the plaintiff had not lost its lien as between it and Griffin & Co. The case is governed by the rule in *Townsend* v. *Bargy* (57 N. Y., 665). This is, that the value to be assessed as against the owner or his representatives is the creditor's claim, with interest.

The result of the discussion may now be summed up. The title to the grain in controversy was held at Toledo by the plaintiff in trust, and after its own advances were paid any residuary interest was to be made over to T. W. Griffin & Co. The canal bill of lading recognized the true relation of the parties and left the title in the *same way*. The fact that this bill came into the hands of Griffin & Co., through the act of Young Brothers, was of no importance, as the bill did not import a delivery to the former firm. Shaw & Co.

could not safely repose on the mere possession of Griffin & Co., but were bound to look into the shipping documents, and are accordingly chargeable with constructive notice of their contents. The Guaranty Company are in the same position with Shaw & Co. The warehouse receipt being mere waste paper, that company can claim no rights under it. Such a " warehouse receipt " is not one intended by the factors' act. That refers to the receipts given in foreign trade or importation. (*Cartwright* v. *Wilmerding*, 24 N. Y., 528.) Even if it were within the intent of the act, it would not help the defendants, as it did not rest on any confidence or trust reposed by the owner in them, or in those from whom they received possession.

The plaintiff, accordingly, could maintain an action of replevin against these defendants based on its property, whether general or special, in the goods.

Considerable stress was laid at the argument, by counsel on either side of the case, on the great consequences to commerce of a decision in this cause adverse to their respective views. Finding the principles of law clearly settled, we are bound to administer them as they have come down to us from our predecessors. We, however, believe that a decision cannot, on the whole, be adverse to commercial interests, which, while it recognizes the convenience of merchants and the great value and importance of the factors' act, requires of those who advance money on commercial documents the observance of reasonable diligence and the obligation to make reasonable inquiry, and enables owners of property on the great transportation lines of inland commerce to secure it from the frauds and depredations of mere custodians and bailees, in whom no special confidence is reposed. While commercial convenience must be respected, the rights of property must not be sacrificed. It is not a case for the application of the rule, that where one of two persons must suffer, that one must sustain the loss who has reposed the confidence. No confidence has been reposed in the person under whom the defendants claim. On the other hand, great

care was taken to keep the title to the property and the indicia of ownership regularly in the plaintiff. The true interests of commerce demand that the claims under bills of lading and other such instruments should be scrupulously protected, since commerce will not flourish where the rights of property are not respected.

The judgment of the court below should be reversed and a new trial ordered.

All concur.

Judgment reversed.