## SCHWAB et al. v. OATMAN et al.

### (Supreme Court, Trial Term, New York County.)

1. SALES—PASSING TITLE—DELIVERY—CUSTOM.

    A contract for the sale of cotton duck specified the quantity, price, and terms, and provided that 5,000 yards should be delivered promptly, and the balance about April 15, 1903, according to shipping directions to be received from the buyer. The contract was duly numbered, and the goods paid for as invoices were received from the selling agents, from whom the goods were purchased. The goods were packed in bales numbered from 1 to 42. All but the first shipment were held by the selling agents under a custom that the agents should hold such goods until called for by the buyers. Before the goods were called for the agents stored them and obtained loans thereon, with the exception of bale No. 42, which remained in the agents' possession marked as "held" for the buyers. The selling agents became insolvent, and were unable to pay the loans made on the goods by the warehousemen. Held, that the specific goods had been set apart for the buyers, and that title was in them as against the warehousemen.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 529–534.]

2. SAME—BONA FIDE PURCHASERS.

    The rule that a bona fide purchaser of goods for a valuable consideration in ordinary course of trade, without notice of any adverse claim or circumstances which would charge an ordinarily prudent man with notice thereof, will be protected against the original owner, applies only where such owner by his own direct voluntary act has conferred on the person from whom the bona fide purchaser derives title the apparent right of ownership of the property or right of disposal as agent.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 659–671.]

3. SAME—POSSESSION.

    Where plaintiffs, having purchased and paid for a lot of cotton cloth to be used in their cotton converting business, left a quantity thereof in the possession of the selling agents, from whom it was purchased, in accordance with the custom of the business, the agents' possession was not such as to deprive plaintiffs of the right to recover the cloth from the agents' pledgee.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 692–696.]

4. FACTORS—PLEDGE OF GOODS—FACTORS' ACT—CONSTRUCTION.

    Factors' Act, Laws 1830, p. 203, c. 179, § 3, provides that every factor or other agent, not having documentary evidence of title, but who has possession of goods for the purpose of sale or as security for advances to be made or obtained on the goods, shall be deemed the true owner, so far as to validate a contract made by the agent with any other person for the sale of the merchandise for any money advanced on a negotiable instrument or other written obligation given by such person on faith thereof. Held, that where goods belonging to plaintiffs were left in the possession of the selling agents, according to a custom of the business, until called for, neither for sale nor as security for advances to be made or obtained thereon, a pledge of the goods by such agents was not enforceable, under such act, against plaintiffs.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Factors, § 83.]

5. WAREHOUSEMEN—STORAGE OF GOODS—ADVANCES—LIEN.

    Laws 1902, p. 1776, c. 608, § 2, declares that a warehouseman shall have a lien on goods stored with him for his charges for storage, cartage, labor, freight, insurance, and "other advances" thereon, including weighing and cooperage in relation to the goods or other goods belonging to

the same owner, and that he may detain the goods until the lien is paid. *Held*, that the term "advances," as so used, did not include loans made on security of the goods, but was limited to expenditures in handling and protecting the goods.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 1, pp. 214–218; vol. 8, pp. 7566–7567.]

6. SAME—STORAGE CHARGES ON OTHER GOODS.

Laws 1902, p. 1776, c. 608, § 2, gives a warehouseman a lien on goods stored for storage charges, etc., on such goods or other goods "belonging to the same owner." *Held*, that the words "other goods belonging to the same owner" should be restricted to actual, as distinguished from apparent, ownership due to possession, so that where selling agents, in possession of goods belonging to plaintiffs, stored the goods with other goods belonging to such agents, the warehouseman was not entitled to a lien on plaintiffs' goods for the storage charges on the goods belonging to the agents.

Replevin by Samuel M. Schwab, Jr., and another, doing business as S. M. Schwab, Jr., & Co., against Frederic A. Oatman and another, doing business as the Mercantile Warehouse Company. Judgment for plaintiffs.

Frank, Neuman & Newgass (Frank F. Neuman, of counsel), for plaintiffs.

John P. Elder (Joseph Fettretch, of counsel), for defendants.

GIEGERICH, J. The plaintiffs, claiming title to 41 bales of cotton duck cloth, have brought an action in replevin against the defendants, who, as warehousemen, were in possession of the same. The plaintiffs purchased the goods in question, together with others, from a corporation known as the "James Freeman Brown Company," which acted as selling agents for various cotton mills. The contract took the form of a letter or memorandum, dated March 28, 1903, signed by the company just named, and reading as follows:

"From James Freeman Brown Co., Mill Selling Agents. Original. Our No. 1,251. New York, March 28, 1903. Sold to Messrs. S. M. Schwab, Jr., & Co., 46 White St., City. Code or brand: 'Carson.' Description: 37½ in. 2.45 yard duck. Put-up of goods: Cuts of 120 yards as far as practicable. Quantity: 50,000 yards. Price: 6½ cents per yard. Terms: Cash 10 days less 3 p. c., or 2 p. c. 10 days, 60 extra, freight paid to finishing works. Tailings and seconds clause void. In addition buyer to take tailings, not to exceed 10 per cent., if contract is not renewed; buyer to take seconds, not to exceed ——— per cent., at ——— cents per yard less than contract price. To be delivered: 5,000 yards promptly; balance about April 15, 1903. To be shipped to (via): First 5,000 yds. to Aspinook Co., Jewett City, Conn. Please send directions for balance. We record your order as above same to be mutually binding. Please carefully note the following clauses: If the production of the mill accepting this contract be curtailed by strikes, or lockouts to counteract strikes, or by any unavoidable accident, the deliveries shall be proportioned to the production. If in anywise incorrectly stated, please notify us at once, otherwise we shall consider this order confirmed by you. A duplicate of this contract goes by this mail to the mill.

"James Freeman Brown Company.
"James M. Curran, P."

The plaintiffs conducted what is known as a "cotton converting business," which consists in taking the goods in their original gray condition and printing them in colors. It was shown by the evidence that

it was a custom in the business for the mill or the agent to hold the goods purchased until called for by the purchasers and then to ship them to the print works designated. The invoices, however, are forwarded promptly as the goods become ready for delivery at the mills, and the contract price becomes payable upon the specified date after the receipt of the invoice by the purchaser according to the period of credit allowed. The custom on the part of the mills or agents to hold goods subject to the instructions of the buyer for forwarding was shown by the evidence to be an elastic one as to time, having no fixed limit of duration. The first shipment by the James Freeman Brown Company under the contract was one of 5,810 yards, sent, as therein provided, to the Aspinook Company, Jewett City, Conn., on or about April 15, 1903. The invoice for this shipment was received by the plaintiffs on or about April 20, 1903, and payment was made by them about June 27, 1903. Subsequently, the plaintiffs received five additional invoices from the James Freeman Brown Company on successive dates from June 13 to July 18, 1903, such invoices covering 42 bales, Nos. 1 to 42, inclusive, which invoices were paid by the plaintiffs within the period of credit fixed in the contract. In the meantime the goods in question had been forwarded to the James Freeman Brown Company, whose place of business, as well as the place of business of the plaintiffs and defendants, is in New York City, and, with the exception of bale 42, had been placed by that company in the warehouse of the defendants, who issued warehouse receipts therefor and made loans thereon. Subsequently the James Freeman Brown Company became insolvent, and when the plaintiffs sought the goods which they had purchased and paid for they found them in the possession of the defendants, who refused to deliver them up, except upon payment of the amount of their advances on the goods in question, and their storage charges on the goods in question and also on other goods which had been stored with them by the said company. The question is whether title to the goods vested in the plaintiffs in such manner as to entitle them to possession from the defendants without complying with the latter's demands for reimbursement. The absolute good faith of both the plaintiffs and the defendants in the entire transaction is conceded. Neither is there any dispute as to any of the facts, except as to the existence of the custom of mills and selling agents to hold goods subject to the shipping instructions of purchasers; and on this point I find in favor of the plaintiffs, as above stated, namely, that such a custom exists and that the duration of the period during which goods will be so held is an elastic one and has no fixed limit.

The first question to be considered is whether the facts are such as to show an appropriation of specific goods to the plaintiffs, notwithstanding the fact that possession still remained in the selling company, in such manner as to transfer title to the plaintiffs. On this point we have the following facts: That, the number "1,251" appears on the written contract or memorandum above referred to; the words being "Our No. 1,251." This number appears on the various invoices forwarded to the plaintiffs from time to time by the selling agents, sometimes in the form of the expression "Your Order No. 1,251," but more generally in the form "Our Contract No. 1,251." The invoices further

bear the words "Detailed Invoice of Merchandise Bought of James Freeman Brown Co., Mills Selling Agents," and contain a list of the numbers of the respective bales and the varying quantity in yards which each contained, together with a statement of the kind of goods. Each invoice also bore an invoice number, to which reference will be made later. The facts above referred to, without reference to anything else or any discussion, indicate sufficiently, I think, that it was the intention to segregate and appropriate to the plaintiffs as their property the bales thus specified by the bale number and the amount in yards and the brand word or designation of the goods. Another significant circumstance in this connection, if anything else was necessary, is found in the fact that bale No. 42 never came into the possession of the defendants, but was found in the possession of the James Freeman Brown Company and bore a tag containing, among other things, the following words written by the shipping clerk of the James Freeman Brown Company, to wit: "Held for S. M. Schwab." There is still other evidence indicating with equal strength that the goods were deemed to belong to the plaintiffs. Furthermore, most of the invoices bore the statement that the bill was payable to Ladenburg, Thalman & Co., and a direction that checks should be made payable to the order of that company and mailed direct, and on the strength of such invoices and the credit and liability of the plaintiffs as purchasers of the goods therein specified the James Freeman Brown Company obtained advances from Ladenburg, Thalman & Co. on the several invoices. There is still further evidence contained in the books and other records of the James Freeman Brown Company with respect to these various invoices (including the retention and repetition of the invoice number and consequent tracing and identification of each invoice thereby), all going to corroborate the evidence above referred to and to strengthen the proof that these specific goods had been set aside and treated by the seller as goods of the purchaser, the plaintiffs. Without stopping to state the evidence further, it is enough to say that the case seems to be clearly within the rules laid down in the authorities. Bailey v. Hudson R. R., 49 N. Y. 70; Kimberly v. Patchin, 19 N. Y. 330, 75 Am. Dec. 334; Ingalls v. Herrick, 108 Mass. 351, 11 Am. Rep. 360; Barrett v. Goddard, 3 Mason, 107, 2 Fed. Cas. 911; Benjamin on Sales (7th Am. Ed.) p. 351, and cases there cited.

The next question is whether, having been once vested with title to the bales in question, the plaintiffs did anything which could be deemed as divesting themselves of such ownership or as estopping them from asserting it. The rule as laid down in Saltus v. Everett, 20 Wend. 267, 32 Am. Dec. 541, where the question is elaborately discussed and the authorities examined, is that an honest purchaser, who buys for a valuable consideration in the course of trade, without notice of any adverse claim or any circumstances which might lead a prudent man to suspect the existence of such adverse claim, will be protected in his title against the original owner in those cases, and in those cases only, where such owner has by his own direct, voluntary act conferred upon the person from whom the bona fide vendee derives title the apparent right of property as owner, or of disposal as an agent. See, also, Williams v. Merle, 11 Wend. 80, 25 Am. Dec. 604; Barnard v. Campbell, 55

N. Y. 456, 14 Am. Rep. 289; Collins v. Ralli, 20 Hun, 246; Smith v. Clews, 114 N. Y. 190, 21 N. E. 160, 4 L. R. A. 392, 11 Am. St. Rep. 627; Follett Wool Co. v. Utica Trust & Dep. Co., 84 App. Div. 151, 82 N. Y. Supp. 597. The argument on behalf of the defendants seems to be that the plaintiffs, by leaving the goods in the possession of the James Freeman Brown Company, after tender of delivery by the latter, brought themselves within the latter portion of the rule above laid down. Whether this is so or not depends upon the custom and practice in the cotton converting business. As was said in Barnard v. Campbell, 55 N. Y. 456, 463, 14 Am. Rep. 289:

"It is not every parting with the possession of chattels or documentary evidence of title that will enable the possessor to make a good title to one who may purchase from him. So far as such a parting with the possession is necessary in the business of life or authorized by the custom of trade, the owner of the goods will not be affected by a sale by the one having the custody and manual possession"—citing various authorities.

The opinion then goes on to state that, in order to create an estoppel by which the owner may be deprived of his property, such owner must clothe the person assuming to dispose of the property with the apparent title to or authority to dispose of it, and the person alleging the estoppel must have acted and parted with value upon the faith of such apparent ownership or authority, so that he will be the loser if the appearances to which he trusted are not real. See, also, Smith v. Clews, supra; Follett Wool Co. v. Utica Trust & Dep. Co., supra; Collins v. Ralli, supra. Having found, as I have, that the plaintiffs were only following the custom of their business in leaving the goods in the possession of the seller until they were ready to receive the goods and to designate points of delivery, I must necessarily conclude, upon the authorities, that they did not thereby estop themselves from asserting their title against subsequent honest purchasers like the defendants.

It is necessary now to proceed to consider whether the circumstance that the sellers were factors affects this case. The so-called factors' act (chapter 179, p. 203, Laws 1830) provides in part as follows:

"Sec. 3. Every factor or other agent, intrusted with the possession of any bill of lading, custom house permit or warehouse keeper's receipt for the delivery of any such merchandise, and every such factor or agent not having the documentary evidence of title who shall be intrusted with the possession of any merchandise for the purpose of sale or as a security for any advances to be made or obtained thereon, shall be deemed to be the true owner thereof, so far as to give validity to any contract made by such agent with any other person for the sale or disposition of the whole or any part of such merchandise for any money advanced or negotiable instrument or other obligation in writing given by such other person upon the faith thereof."

In this case, however, the factor or agent, to wit, the James Freeman Brown Company, was not intrusted with the possession of the merchandise, either for the purpose of sale or as security for advances to be made or obtained thereon. In Soltau v. Gerdau, 119 N. Y. 380, 394, 23 N. E. 864, 16 Am. St. Rep. 843, the court points out the difference between the English factors' act and our own statute, and emphasizes the distinction that here, in order to bring a case within the statute, it must appear that the goods were intrusted to an agent for sale, and that it is not sufficient that they were intrusted to a mere commer-

cial agent, or to one whose business it is to make sales of goods. The opinion, at page 395 of 119 N. Y., page 868 of 23 N. E. (16 Am. St. Rep. 843), contains the following emphatic observation:

"Our statute contemplates the act of the owner in voluntarily and specifically intrusting the goods to some factor or agent for sale, and to no other agent and for no other purpose."

See, also, First Nat. Bank of Toledo v. Shaw, 61 N. Y. 283; Kinsey v. Leggett, 71 N. Y. 387; N. Y. Security & Trust Co. v. Lipman, 157 N. Y. 551, 52 N. E. 595.

Another point to be considered is whether the defendants, by reason of being warehousemen, are in any better position. Chapter 608, p. 1776, of the Laws of 1902, in its second section, provides as follows:

"A warehouseman shall have a lien upon goods stored with him for his charges for storage, cartage, labor, freight, insurance and other advances thereon, including weighing and coopering in relation to such goods or other goods belonging to the same owner, and he may detain such goods until his lien is paid. * * * A warehouseman shall not have a lien for storage charges upon stolen goods."

This statute, it should be observed, is in disfavor with the courts, certain provisions of it having been held unconstitutional in Lissner v. Cohen, 49 Misc. Rep. 272, 97 N. Y. Supp. 227, while in Hazlett v. Hamilton S. & W. Co., 47 Misc. Rep. 660, 94 N. Y. Supp. 580, it was observed that the act was apparently of doubtful constitutionality, citing Follett Wool Company v. Albany Terminal Warehouse Company, 61 App. Div. 296, 70 N. Y. Supp. 474, which latter case was decided under the previous warehousemen's act, namely, chapter 633, p. 433, of the Laws of 1895. I cannot find that the portion of the statute involved in this action has ever been before the courts for determination; the decisions above cited having reference to making such warehousemen parties, and not to the subject of their lien, as the present action does. It seems to me that the act should be construed as embracing only such things as would naturally be understood as meant by the expression "storage charges," having in view, the entire portion of the statute above quoted. The words "other advances," coming after cartage, labor, freight, and insurance, under the familiar principle of construing general words with reference to the specific words preceding them, and limiting their significance accordingly, should be held to mean advances of the general nature of cartage, labor, freight, insurance, or other advances made in handling or protecting the goods, as distinguished from the very different meaning which might sometimes be given to the word "advances," namely, loans upon the security of the goods. The phrase "including weighing and coopering in relation to such goods," immediately following the words "other advances thereon," confirm the view that it was the intention of the Legislature to give a limited, and not a broad, meaning to the word now under consideration. In other words, the act should be construed as expressing the legislative purpose to secure a warehouseman, strictly as a warehouseman, for everything he does as such in connection with the goods, but was not intended to go further and protect him as a banker, and to give him an advantage over other bankers or money lenders, if he should see fit to make loans upon the goods stored with him. My con-

clusion is, therefore, that the defendants had no lien upon the goods in suit for the sums they loaned upon them.

The only question remaining is whether the defendants' lien for the amount due them for storage extends to the amounts due for storing other goods than those in suit, brought to their place and stored with them by the James Freeman Brown Company. When the plaintiffs demanded delivery they offered to pay the storage charges on the bales in question; but the defendants demanded payment of their charges for storing other goods brought by that company. On this point, too, I think the statute should not be construed too broadly, and that the words "other goods belonging to the same owner" should be restricted to actual ownership, as distinguished from apparent ownership, due to possession. Such a construction will secure to the warehouseman under all circumstances, except cases of downright theft, his legitimate charge for each lot of goods, and, if he collects for each lot as he allows it to be taken away from the house, he can meet no loss. This construction, at the same time, would guard against the inequitable result sought to be accomplished in this case of requiring the owner of one lot of goods to pay storage charges against other goods belonging to other owners, which charges might have been collected from the proper persons, had the warehouseman taken payment for each lot as he surrendered possession of it.

There should be judgment in favor of the plaintiffs for the possession of 34 bales of cotton duck cloth, 7 of the bales in suit having been returned after this action was brought, and for $456 damages for the detention thereof, besides the costs of this action. In case possession of the said 34 bales is not delivered to the plaintiffs, they should recover from the defendants the sum of $3,567.05, the value thereof at the time of the trial, with interest thereon from the 25th day of May, 1906, the last day of the trial, and the sum of $456 damages for the detention thereof, with the costs of this action. Requests for findings of fact and conclusions of law have been passed upon as indicated upon the margin thereof. Submit for signature an engrossed copy of the complete decision.